******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* TERRANCE BROWN
## (SC 19960)

Palmer, McDonald, Robinson, D'Auria, Mullins and Kahn, Js.*

*Syllabus*

Pursuant to statute ([Rev. to 2009] § 54-47aa), a law enforcement official may request an ex parte order from a Superior Court judge to compel a telecommunications carrier to disclose basic cell phone subscriber information and information identifying the origin and destination of each communication generated or received by the subscriber. The judge shall grant the order if the law enforcement official states a reasonable and articulable suspicion that a crime has been or is being committed.

The defendant, who had been charged in multiple informations with various crimes, including burglary and larceny, for his alleged role in the theft or attempted theft of automated teller machines from gas stations and convenience stores, filed motions to suppress the historical and prospective cell phone call and location data obtained by the state as a result of three ex parte orders that had been issued pursuant to § 54-47aa. A police task force had been organized to investigate a series of crimes in which an individual or individuals, using various stolen vehicles, had backed those vehicles into the stores or gas stations and removed freestanding automated teller machines. As a result of information obtained by the police, an officer conducted a motor vehicle stop of the defendant, who was released after questioning. After uncovering further information about the defendant, including his cell phone number, the police determined that the defendant may have been involved in the various thefts under investigation. The police then obtained the first ex parte order, which directed the defendant's cell phone carrier to disclose the past three months of his cell phone data and other basic subscriber information. An analysis of that data led the police to determine that the defendant had used his cell phone in relevant locations during times and dates that coincided with dates on which the various thefts under investigation had occurred. On the basis of this information, the police obtained two more ex parte orders that were prospective in nature, requiring the defendant's cell phone carrier to disclose caller identification information linked to his cell phone number, including live updates every ten minutes, for two consecutive early morning periods and for a later three day period. Based on the cell phone data that had been obtained pursuant to the orders, J, who had been in communication with the defendant at certain relevant times, was arrested and taken into custody in connection with an automated teller machine theft. During their interview of J, the police revealed to J that his cell phone number was listed in the defendant's phone log and that the cell phone data indicated that the defendant and J had contacted each other at or around the time of certain of the alleged thefts or attempted thefts. J then gave a statement implicating himself and the defendant in connection with many of the thefts and attempted thefts that had been under investigation. Relying on the state's concession that the second and third orders authorizing the disclosure of prospective cell phone data violated § 54-47aa and its determination that the first order authorizing the disclosure of historical data also violated § 54-47aa, the trial court granted the defendant's motions to suppress all of the cell phone data, J's statement to the police, and any potential testimony by J. The trial court also concluded that the state had failed to prove that the inevitable discovery exception to the exclusionary rule applied to J's statement and potential testimony. Thereafter, the trial court granted the defendant's motions to dismiss the charges and rendered judgments thereon, from which the state, on the granting of permission, appealed. *Held*:

1. The trial court correctly concluded that the state obtained the defendant's cell phone data illegally; the state had conceded that the two court orders authorizing the disclosure of prospective cell phone data were obtained in violation of § 54-47aa, and the disclosure of historical cell phone data pursuant to the first ex parte order violated the defendant's

fourth amendment rights in light of the United States Supreme Court's recent decision in *Carpenter* v. *United States* (138 S. Ct. 2206), in which the court held that an individual has a legitimate expectation of privacy in the historical record of his physical movements as captured through cell phone data and that the government must generally obtain a warrant supported by probable cause before acquiring such data, because the police obtained the defendant's historical data on the basis of a reasonable and articulable suspicion, rather than on the basis of a warrant supported by probable cause.

2. The trial court correctly concluded that the suppression of the historical and prospective cell phone data that had been illegally obtained by the state was the appropriate remedy: notwithstanding the state's claim that, because the police officers acted in reasonable reliance on the court's order authorizing the disclosure of the historical cell phone data, they acted in good faith, and that the purpose of the exclusionary rule, namely, to deter police misconduct, did not apply under these circumstances,, this court's prior case law has uniformly established a bright-line rejection of the good faith exception to the exclusionary rule under the state constitution, and, accordingly, the trial court properly suppressed the defendant's historical cell phone data; moreover, the state could not prevail on its claim that, with respect to the disclosure of the prospective cell phone data, suppression was not a remedy for a violation of § 54-47aa, this court having determined, after reviewing the statute's text and legislative history, as well as related statutes, that the statute's legislative history provided strong support for the conclusion that the legislature intended that suppression would be an appropriate remedy for violations of § 54-47aa and that the tracking of the defendant's cell phone, in the absence of a showing of probable cause and in violation of § 54-47aa, implicated important privacy interests that are traditionally the type protected by the fourth amendment, which required the application of the exclusionary rule and the suppression of the prospective cell phone data.

3. The trial court correctly determined that the state failed to meet its burden of proving that the inevitable discovery exception to the exclusionary rule applied to J's statement to the police implicating the defendant and J's potential testimony, which the trial court suppressed on the ground that the state conceded that, in the absence of the illegally obtained cell phone data, the police would not have interviewed J and obtained his statement; the trial court properly determined that the state, in order to bear its burden of proving that that inevitable discovery exception applied, was required to prove by a preponderance of the evidence not only that the police would have identified and located J by legal means, but also that J would have cooperated and provided the same information in the absence of the illegally obtained cell phone data, and, although the state presented credible evidence at the defendant's suppression hearing that it inevitably would have discovered J by lawful means, it failed to present any evidence to demonstrate that J would have similarly cooperated with the police in the absence of being confronted with the illegally obtained cell phone data.

Argued December 15, 2017—officially released April 2, 2019

*Procedural History*

Informations, in twelve cases, charging the defendant with nine counts each of the crimes of larceny in the third degree and criminal mischief in the first degree, six counts of the crime of burglary in the third degree, four counts each of the crimes of conspiracy to commit burglary in the third degree and conspiracy to commit larceny in the third degree, three counts of the crime of conspiracy to commit criminal mischief in the first degree, two counts each of the crimes of attempt to commit burglary in the third degree and criminal trover in the first degree, and one count each of the crimes of burglary in the first degree, larceny in the fourth degree, conspiracy to commit larceny in the fourth degree, larceny in the fifth degree and possession of

burglar tools, brought to the Superior Court in the judicial district of New Haven, where the court, *Blue, J.*, granted the defendant's motions to suppress certain evidence; thereafter, the court, *Clifford, J.*, granted the defendant's motions to dismiss the charges and rendered judgments thereon, from which the state, on the granting of permission, appealed. *Affirmed.*

*Harry Weller*, senior assistant state's attorney, with whom were *John P. Doyle, Jr.*, senior assistant state's attorney, and, on the brief, *Patrick J. Griffin*, state's attorney, *Timothy J. Sugrue*, assistant state's attorney, and *Dana Tal*, certified legal intern, for the appellant (state).

*Jennifer B. Smith*, for the appellee (defendant).

*Opinion*

KAHN, J. The present case is in large part governed by the recent decision of the United States Supreme Court in *Carpenter* v. *United States,*      U.S.      , 138 S. Ct. 2206, 2217, 2221, 201 L. Ed. 2d 507 (2018), in which the court held that an individual has "a legitimate expectation of privacy in the record of his physical movements as captured through [cell site location information]" (CSLI), and, therefore, "the [g]overnment must generally obtain a warrant supported by probable cause before acquiring such records." The state appeals[1] from the judgments of dismissal rendered by the trial court after it granted the oral motion of the defendant, Terrance Brown, seeking dismissal of all charges in thirteen separate dockets.[2] The state claims that the trial court improperly granted the defendant's motions to suppress any and all "cellular-telephone-derived location information" obtained by the state as a result of three ex parte orders that had been granted pursuant to General Statutes (Rev. to 2009) § 54-47aa.[3] In their original briefs and arguments to this court, the parties focused primarily on whether the trial court properly granted the defendant's motions on the basis of its conclusion that the state obtained the prospective and historical CSLI in violation of § 54-47aa, and that suppression of the records was the appropriate remedy. Following oral argument, however, this court stayed the appeal pending the decision of the United States Supreme Court in *Carpenter* and ordered the parties to submit supplemental briefs concerning the relevance of that decision to this appeal. In light of the court's holding in *Carpenter*, we conclude that, because the state obtained the defendant's historical CSLI solely on the basis of a reasonable and articulable suspicion, rather than on a warrant supported by probable cause, the records were obtained in violation of the defendant's fourth amendment rights. We further conclude that the trial court properly determined that suppression of both the historical and prospective CSLI—which the state concedes it obtained in violation of § 54-47aa—was the appropriate remedy. Finally, we conclude that the trial court properly rejected the state's reliance on the inevitable discovery doctrine. Accordingly, we affirm the judgments of the trial court.

The record reveals the following facts and procedural background. From July 30 through November 23, 2010, Connecticut State Police Detective Patrick Meehan was a member of a task force investigating a series of burglaries and attempted burglaries at a variety of gas stations and convenience stores in the New Haven, Waterbury and Fairfield areas. In the late night and early morning hours, the thieves targeted businesses that had freestanding ATMs inside a windowed storefront. Using a stolen vehicle, in many instances a Dodge Caravan minivan, the thieves backed the vehicle into

the building when the business was closed, smashing through the glass and, in many cases, knocking over the ATM. The thieves would then load the ATM into the back of the vehicle, from which the rear seats had been removed, and drive away. Several of the ATMs had subsequently been recovered; those machines appeared to have been cut open with a reciprocating saw. Three of the ATMs were recovered in a cemetery not far from where the defendant lived. The stolen vehicles were later abandoned in different locations from where the ATMs had been discarded.

Following a task force meeting on September 15, 2010, Meehan learned that, on or about May 26, 2009, a police officer patrolling in the town of Monroe had observed a Dodge Caravan swerve over the double yellow line in the road several times. The officer pulled the Caravan over and, because there was heavy traffic, directed the driver to a nearby parking lot. As the driver of the Caravan began to pull into the parking lot, a Lincoln Navigator pulled up alongside the Caravan. The Lincoln's driver briefly spoke to the driver of the Caravan, then drove away. The Caravan continued into the parking lot but, while the van was still in gear, the driver opened the door and fled on foot. Although the officers attempted to pursue the driver, he was never apprehended or identified. The rear seats of the Caravan, which had been stolen in Bridgeport just prior to the incident, had been removed. The Lincoln Navigator was stopped moments later. At the time of the stop, the defendant, who was driving that vehicle, informed the officers that he was a student at Southern Connecticut State University (Southern) and played for the football team. After being questioned by the officers, the defendant was allowed to leave.

Meehan subsequently began investigating the defendant. From the campus police at Southern, Meehan obtained the defendant's cell phone number and his address in New Haven, a location not far from where a couple of the stolen vehicles had been recovered. When Meehan ran a criminal history check on the defendant, he discovered that he previously had been convicted of burglary and larceny. Specifically, the defendant had been convicted of committing two burglaries over the course of several weeks at a gun shop. Of particular interest to Meehan was the fact that the defendant had used a vehicle to smash through the front door to enter the shop.

On October 4, 2010, Meehan and other police officers conducted overnight surveillance of the defendant. Sometime after 10 p.m., they observed the defendant leave his house, get into his car and drive to the cemetery where three of the stolen ATMs had been recovered approximately two weeks earlier. The officers followed him to the cemetery, where he remained for a few minutes. He then returned to his home and did not leave

for the rest of the night.

On the basis of all of this information, Meehan obtained the first of the three ex parte orders that are the subject of this appeal and which was the sole order that authorized the disclosure of historical cell phone records. In this first ex parte order, issued on October 22, 2010, the court, *Holden, J.*, directed T-Mobile Communications (T-Mobile)[4] to disclose telephone records, including basic subscriber information and call identifying information, pertaining to the defendant's cell phone number for the period of July 29 to September 29, 2010. The order specified that basic subscriber information included "name, address, local and long distant telephone connection records, records of session times and durations, length of service (including start date, and types of service utilized), telephone or instrument number, other subscriber number or identity, assigned internet protocol addresses, and means and source of payment for such service including any credit card or bank account number." "Call identifying information" included "dialing or signaling information that identifies the origin, direction, destination or termination of each communication generated or received by a subscriber or customer by means of any equipment, facility or service of telecommunications carrier." The order also directed the disclosure of "cellular site/tower information including addresses of cellular towers . . . ."

The remaining two ex parte orders were prospective in nature. In the second order, issued on November 15, 2010, the court, *Shaban, J.*, directed T-Mobile to disclose call identifying information for the defendant's cell phone number, including live updates from T-Mobile on cell phone pings every ten minutes between midnight and 6 a.m. on both November 16 and 17, 2010. In the third order, issued on November 22, 2010, the court, *Cremins, J.*, directed T-Mobile to disclose call identifying information for the defendant's cell phone number, including "E911 pings," every ten minutes from midnight on November 23, 2010 until 7 a.m. on November 25, 2010.

From the records disclosed as a result of the October 22, 2010 order, following consultation with other officers who assisted in the analysis of the records, Meehan noticed that, during the period between July 29 and September 29, 2010, the defendant's daily cell phone calls ordinarily stopped sometime between 10 and 11 p.m. There were some exceptions to that general pattern—certain days when the defendant made several phone calls between 2 and 4 a.m. Those dates and times coincided with the dates on which there had been attempted or completed ATM burglaries. In addition, Meehan observed that the location information recovered from the cell phone records often "match[ed] . . . up" with the location of the burglaries or attempts that had occurred on a given date. That is, during the time

period of the burglaries, the defendant's cell phone records showed that his phone was pinging off of nearby cell towers.

Meehan particularly focused on the defendant's phone records for the early morning hours of September 28, 2010, when two attempted or completed ATM burglaries had occurred, both of which had involved stolen vans smashing through storefronts. An ATM was removed from a business in Shelton at approximately 2:15 a.m., and there was an attempt to steal an ATM in Ansonia at 5:04 a.m. At the time that these two incidents occurred, six phone calls were exchanged between the defendant's cell phone and a New Jersey telephone number. Meehan discovered that the New Jersey telephone number was registered under the name "Ollie Twig."

On November 23, 2010, Meehan reported to the Wallingford Police Department, where a suspect, Ramon Johnson, had been arrested and taken into custody in connection with an ATM burglary. The police had located Johnson as a result of the real time tracking of the defendant's CSLI on that date, pursuant to the prospective ex parte order granted on November 22, 2010. During his interview of Johnson, Meehan learned that Johnson, like the defendant, was a student at Southern and a member of the school's football team. Johnson informed Meehan that, when not at school, he lived in New Jersey with his grandmother, Ollie Twig. At that point, Meehan showed Johnson the defendant's phone log for September 28, 2010, which he had obtained pursuant to the October 22, 2010 order, and in the margins of which Meehan had written "Ollie Twig" and drawn arrows pointing to the New Jersey phone number that the defendant had been calling when the Shelton burglary and the Ansonia attempted burglary were taking place. Johnson admitted that the phone number in the log was his and gave a statement implicating himself and the defendant in connection with the series of ATM burglaries and attempted burglaries.

The defendant was subsequently arrested and charged in thirteen separate informations under thirteen different docket numbers, with committing numerous offenses, including burglary, attempt to commit burglary, conspiracy to commit burglary, larceny, conspiracy to commit larceny, criminal mischief and possession of burglar tools. See footnote 2 of this opinion. The defendant filed motions to suppress any and all "cellular-telephone-derived location information," both historical and prospective in nature, as well as any evidence found to be the fruit of such information, including any potential testimony by Johnson.[5] Included in the evidence considered by the trial court during the suppression hearing were stipulated facts submitted by the parties, including: "As a result of the real time tracking of the defendant through the monitoring of

[his] cell site location data, the police were able to track the defendant's activities on November 23, 2010, and to thereby locate [Johnson]. . . . But for the ability of the police to track [the defendant's] movements by monitoring [his] cell phone on a real time basis, Johnson would never have been stopped, detained, arrested or interrogated by the police on November 23, 2010."

Following the suppression hearing, the trial court granted the defendant's motions to suppress in all of the cases pending against him. In its memorandum of decision, the court acknowledged that the defendant's motions implicated both statutory and constitutional principles, but, because the constitutional question of whether the ex parte orders violated the defendant's fourth amendment rights had not yet been clearly settled, the court first considered whether the ex parte orders violated § 54-47aa, and, if so, whether suppression was the proper remedy.

As to the prospective ex parte orders, issued on November 15 and 22, 2010, the state conceded that those orders violated § 54-47aa. The first part of the court's inquiry focused, therefore, on whether the October 22, 2010 order, which authorized the disclosure of the defendant's historical cell phone records, violated § 54-47aa, a question that the court answered in the affirmative. The court then addressed the second issue—whether suppression was the appropriate remedy for evidence that the state had obtained in violation of § 54-47aa. The court acknowledged that suppression was not always required for evidence obtained in violation of state law. The court observed, however, that, because § 54-47aa implicates important fourth amendment privacy interests and because the failure to apply the exclusionary rule would encourage further violations, suppression was the appropriate remedy.

Finally, the court considered the defendant's claim that, because the state had conceded that, in the absence of the illegally obtained CSLI, it would not have interviewed Johnson and obtained his statement implicating himself and the defendant on November 23, 2010, the court should suppress Johnson's statement and potential trial testimony. The court observed that there was ample evidence in the record to sustain the defendant's burden to prove that Johnson's arrest was tainted. The remaining question for the court was whether the state had proven that one of the exceptions to the exclusionary rule applied. The court began with the observation that, because Johnson did not testify at the suppression hearing, "the record is utterly barren concerning the circumstances of [his] interrogation and [his] willingness or unwillingness to give his statements or to testify." Although the court credited the testimony and evidence presented by the state that supported a finding that the state eventually would have identified and located Johnson even without the CSLI, it noted

that it was unclear whether Johnson would have confessed if he had not been confronted with the damning CSLI evidence. In light of that lacuna in the record, the court concluded that the state had failed to prove that it inevitably would have obtained the statement from Johnson incriminating himself and the defendant.[6]

Following the granting of the defendant's motions to suppress, the state entered nolles prosequi on all of the charges against the defendant in the pending cases. In response, the defendant made an oral motion to dismiss all charges, which the trial court granted. This appeal followed.

We consider the question of whether the trial court properly granted the defendant's motions to suppress the CSLI records in two parts. First, we conclude that those records were obtained illegally. The state's concession that the prospective orders were issued in violation of § 54-47aa resolves that question for the two prospective orders. As for the October 22, 2010 ex parte order authorizing the disclosure of approximately three months of the defendant's historical CSLI, we conclude that the order violated his fourth amendment rights. See *Carpenter* v. *United States*, supra, 138 S. Ct. 2206. Second, we conclude that the trial court properly determined that suppression was the appropriate remedy as to all three sets of illegally obtained records. Finally, we conclude that the trial court properly determined that the suppression of those records also required that Johnson's statement and potential testimony be suppressed.

I

We first consider whether the trial court properly concluded that the state obtained the defendant's CSLI illegally. Before proceeding to the substance, we set forth the applicable standard of review of a trial court's decision on a motion to suppress. "A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [W]hen a question of fact is essential to the outcome of a particular legal determination that implicates a defendant's constitutional rights, [however] and the credibility of witnesses is not the primary issue, our customary deference to the trial court's factual findings is tempered by a scrupulous examination of the record to ascertain that the trial court's factual findings are supported by substantial evidence. . . . [W]here the legal conclusions of the court are challenged, [our review is plenary, and] we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision . . . ." (Internal quotation marks omitted.) *State* v. *Kendrick*, 314 Conn. 212, 222, 100 A.3d 821 (2014). Because the state's claim that the trial court improperly concluded that law enforcement obtained the CSLI illegally challenges the trial court's legal con-

clusions, we exercise plenary review. See id.

We begin, as did the trial court, with the state's concession of the illegality of the two prospective ex parte orders. Given that concession, we need only resolve the legality of the October 22, 2010 ex parte order, which authorized the disclosure of the defendant's historical CSLI. That question is resolved by the recent decision of the United States Supreme Court in *Carpenter* v. *United States*, supra, 138 S. Ct. 2206. In *Carpenter*, the court considered whether the state "conducts a search under the [f]ourth [a]mendment when it accesses historical cell phone records that provide a comprehensive chronicle of the user's past movements." Id., 2211. The court answered that question in the affirmative and held that "an individual maintains a legitimate expectation of privacy in the record of his physical movements as captured through CSLI." Id., 2217. Accordingly, the state "must generally obtain a warrant supported by probable cause before acquiring such records." Id., 2221.

It is undisputed that the state did not obtain a warrant supported by probable cause in order to procure the defendant's historical CSLI. Instead, the state relied on § 54-47aa (b) to obtain the ex parte order authorizing the disclosure of those records. At the time of the offenses, § 54-47aa (b) authorized a judge of the Superior Court to issue an ex parte order compelling a telecommunications carrier to disclose call identifying information and/or basic subscriber information pertaining to a customer if the law enforcement official seeking the order swore under oath that there was a "reasonable and articulable suspicion that a crime has been or is being committed or that exigent circumstances exist and such call-identifying or basic subscriber information is relevant and material to an ongoing criminal investigation."[7] General Statutes (Rev. to 2009) § 54-47aa (b). Accordingly, because the record is clear that the state obtained the defendant's historical CSLI in the absence of a warrant supported by probable cause, the disclosure of those records violated the defendant's fourth amendment rights.[8]

## II

We next address the question of whether the trial court properly concluded that suppression of the historical and real time CSLI was the appropriate remedy. The issue presents a question of law over which we have plenary review. See, e.g., *State* v. *Kendrick*, supra, 314 Conn. 222. Because the illegality of the historical CSLI is grounded on our conclusion that the seizure of those records violated the defendant's fourth amendment rights, we first consider whether those records properly were suppressed. The state contends that, because the officers acted in reasonable reliance on the court's ex parte order, they acted in good faith and the purpose of the exclusionary rule—to deter police misconduct—does not apply. In response, the defen-

dant relies on the greater protection provided under the state constitution for fourth amendment violations. That is, relying on this court's decision in *State* v. *Marsala*, 216 Conn. 150, 171, 579 A.2d 58 (1990), the defendant responds that Connecticut has rejected the good faith exception to the application of the exclusionary rule. We agree with the defendant.

We have recognized that, "[a]s a general principle, the exclusionary rule bars the government from introducing at trial evidence obtained in violation of the fourth amendment to the United States constitution. See *Wong Sun* v. *United States*, 371 U.S. 471, 485, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963). [T]he rule's prime purpose is to deter future unlawful police conduct and thereby effectuate the guarantee of the [f]ourth [a]mendment against unreasonable searches and seizures. *United States* v. *Calandra*, 414 U.S. 338, 347, 94 S. Ct. 613, 38 L. Ed. 2d 561 (1974)." (Internal quotation marks omitted.) *State* v. *Brunetti*, 279 Conn. 39, 72–73, 901 A.2d 1 (2006), cert. denied, 549 U.S. 1212, 127 S. Ct. 1328, 167 L. Ed. 2d 85 (2007).

Under the "[good faith] exception" to the exclusionary rule under the federal constitution, suppression of "reliable physical evidence seized by officers reasonably relying on a warrant issued by a detached and neutral magistrate" is not required. *United States* v. *Leon*, 468 U.S. 897, 913, 104 S. Ct. 3405, 82 L. Ed. 2d 677 (1984). In *Marsala*, however, this court categorically rejected the good faith exception, holding that it is "incompatible with article first, § 7, of our state constitution, which provides: 'The people shall be secure in their persons, houses, papers and possessions from unreasonable searches or seizures; and no warrant to search any place, or to seize any person or things, shall issue without describing them as nearly as may be, nor without probable cause supported by oath or affirmation.' " *State* v. *Marsala*, supra, 216 Conn. 159. Nothing in our decision in *Marsala* suggested that we intended courts to accord the higher level of protection to defendants on a case-by-case basis. Instead, the decision established a bright-line rejection of the good faith exception under our state constitution. Id., 171.

Our subsequent decisions citing to *Marsala* uniformly have characterized *Marsala* as categorically rejecting the good faith exception—not, as suggested by the state, on a case-by-case basis. See, e.g., *State* v. *Kelly*, 313 Conn. 1, 15 n.13, 95 A.3d 1081 (2014) (in *Marsala*, court declined "to recognize, for purposes of state constitution, good faith exception applicable to fourth amendment exclusionary rule"); *State* v. *Buie*, 312 Conn. 574, 584, 94 A.3d 608 (2014) (summarizing holding of *Marsala* as "good faith exception to warrant requirement does not exist under article first, § 7, of state constitution"); *State* v. *Jenkins*, 298 Conn. 209, 291, 3 A.3d 806 (2010) (*Katz, J.*, dissenting) (noting that *Marsala*

"reject[ed] good faith exception to exclusionary rule adopted by United States Supreme Court"); *State* v. *Lawrence*, 282 Conn. 141, 205–206, 920 A.2d 236 (2007) (citing general principle relied on in *Marsala* for rejection of good faith exception: "[a]lthough we recognize that the exclusionary rule exacts a certain cost from society in the form of the suppression of relevant evidence in criminal trials, we conclude, nevertheless, that this cost is not sufficiently substantial to overcome the benefits to be gained by our disavowal of the *Leon* court's good faith exception to the exclusionary rule" [internal quotation marks omitted]). Accordingly, because the only exception on which the state relies is one that this court expressly and consistently has held is not recognized in Connecticut, the trial court properly suppressed the CSLI obtained pursuant to the October 22, 2010 ex parte order.

As to the two prospective ex parte orders issued on November 10 and 22, 2010, once again we begin with the state's concession that those two orders were obtained in violation of § 54-47aa.[9] Notwithstanding that concession, the state contends that, because § 54-47aa does not identify suppression as an available remedy for a violation of the statute, the trial court improperly granted the motion to suppress the CSLI obtained as a result of those two orders. The defendant responds that the trial court properly concluded that, because § 54-47aa implicates important fourth amendment interests, suppression of the CSLI obtained as a result of the two prospective orders is required. We conclude that, although the plain language of § 54-47aa is unclear as to whether suppression is available as a remedy for a violation of the statute, the legislative history provides strong, albeit not conclusive, support for the conclusion that the legislature intended the remedy to be available for violations. We find further support for interpreting § 54-47aa to provide for suppression as the appropriate remedy in the policy principles underlying the exclusionary rule itself. That is, we conclude that the real time tracking of the defendant's cell phone, in the absence of a showing of probable cause and in violation of § 54-47aa, implicated important fourth amendment interests, requiring the application of the exclusionary rule. We therefore conclude that the trial court properly determined that the violation of § 54-47aa required the suppression of the CSLI obtained from the two prospective ex parte orders.

The question of whether § 54-47aa provides suppression as a remedy for a violation presents a question of statutory interpretation, over which we exercise plenary review, guided by well established principles regarding legislative intent. See, e.g., *Kasica* v. *Columbia*, 309 Conn. 85, 93, 70 A.3d 1 (2013) (explaining plain meaning rule under General Statutes § 1-2z and setting forth process for ascertaining legislative intent). We turn first to the statutory text, which does not clarify

whether the legislature intended to require or allow suppression for a violation of § 54-47aa. The statute neither expressly identifies nor precludes *any* remedies for violations of the statute. See footnote 3 of this opinion. By contrast, as the state points out, General Statutes § 54-41m expressly provides that a person aggrieved by a communication that was allegedly "unlawfully intercepted" pursuant to chapter 959a, which governs wiretapping and electronic surveillance, may file a motion to suppress.[10] The state contends that the provision of suppression as a remedy for a violation of the wiretapping statutes,[11] contrasted with the absence of a similar provision for a violation of § 54-47aa, supports its position that suppression is not available as a remedy pursuant to § 54-47aa.

We observe, however, that a comparison of § 54-47aa with the federal Stored Wire and Electronic Communications and Transactional Records Access Act (SCA), one of the statutory schemes on which § 54-47aa generally was modeled, yields a different contrast. Unlike § 54-47aa, the SCA lists the remedies available for a violation of that act. See 18 U.S.C. § 2707 (b) (2012) (authorizing persons aggrieved by violations of SCA to bring civil action and listing "appropriate relief," including equitable or declaratory relief, damages and attorney's fees). Suppression of illegally obtained evidence is not one of the listed remedies. Furthermore, the SCA includes an exclusivity of remedies provision: "The remedies and sanctions described in this chapter are the only judicial remedies and sanctions for nonconstitutional violations of this chapter." 18 U.S.C. § 2708 (2012). By contrast, as we have noted, § 54-47aa neither specifies available remedies nor limits them. The legislature easily could have incorporated the SCA's limited list of remedies into § 54-47aa, along with the SCA's exclusivity of remedies provision. The failure to do so supports the conclusion that the legislature did not intend to limit the remedies available for a violation of § 54-47aa.[12] At best, therefore, the plain language of the statute is ambiguous as to whether suppression is an available remedy.

Because the plain language of the statute is ambiguous, we turn to the legislative history, which provides at least some support for the conclusion that the legislature intended that suppression would be available as a remedy for abuses of § 54-47aa. Section 54-47aa was first enacted through No. 05-182 of the 2005 Public Acts in order to address the difficulties encountered by law enforcement in gaining access to the basic subscriber information associated with a telephone number. Previously, that information had been readily obtained from local telephone companies. With the expansion of the telecommunications industry and the increasing prevalence of cell phones, however, law enforcement personnel increasingly found themselves dealing with out of state providers that were less cooperative in

providing that basic information. See 48 S. Proc., Pt. 11, 2005 Sess. pp. 3435–36, remarks of Senator Andrew J. McDonald.

One of the primary concerns in crafting the legislation was to strike the proper balance between the need for law enforcement to have access to such information and the need to safeguard the legitimate privacy interests of citizens. See 48 H.R. Proc., Pt. 26, 2005 Sess., pp. 7869, 7871, remarks of Representative Michael P. Lawlor. During the public hearing on the bill, Fanol Bojka, an attorney speaking on behalf of the Connecticut Criminal Defense Lawyers Association, spoke in opposition to the bill, expressing concern that the standard required in the proposed legislation was merely a reasonable suspicion rather than probable cause. Conn. Joint Standing Committee Hearings, Judiciary, Pt. 14, 2005 Sess., pp. 4122, 4124–25. In light of the lower standard and the absence of any express language specifying any recourse available to aggrieved parties, Bojka questioned: "What is the remedy under this bill . . . if there are abuses?" Id., 4125. Representative Robert Farr responded immediately that suppression would be the appropriate remedy. Id. Nothing in the legislative history counters that representation.

Representative Farr's assertion that suppression is available as a remedy for a violation of § 54-47aa is consistent with the legal principles governing suppression. As the trial court correctly noted, the "Connecticut Code of Evidence does not prescribe a specific rule governing the admissibility of evidence obtained under these circumstances. 'Where the code does not prescribe a rule governing the admissibility of evidence, the court shall be governed by the principles of common law as they may be interpreted in the light of reason and experience.' Conn. Code Evid. § 1-2 (b)." Reason and experience counsel that the exclusionary rule requires the suppression of prospective CSLI obtained in violation of § 54-47aa. Although the United States Supreme Court has applied "the exclusionary rule primarily to deter constitutional violations"; *Sanchez-Llamas* v. *Oregon*, 548 U.S. 331, 348, 126 S. Ct. 2669, 165 L. Ed. 2d 557 (2006); it has identified narrow circumstances under which the rule properly applies to exclude evidence obtained in violation of statutory law. The circumstances under which the exclusionary rule may be applied to statutory violations, however, has been limited to those violations that implicate "important [f]ourth [or] [f]ifth [a]mendment interests." Id.[13]

In the present case, the evidence obtained in violation of § 54-47aa—the prospective CSLI yielded from the real time tracking of the defendant's cell phone—implicates important privacy interests that are traditionally the type protected by the fourth amendment. In fact, as one court has observed, much of the rationale that

the court relied on in *Carpenter* to hold that accessing historical CSLI implicates legitimate privacy interests applies with equal force to CSLI obtained by real time tracking, because the two types of records are not "meaningfully different . . . ." *Sims* v. *State*, Docket No. PD-0941-17, 2019 WL 208631, *7 n.15 (Tex. Crim. App. January 16, 2019). In *Carpenter*, the court began its analysis by describing the nature of the interests implicated, explaining: "A person does not surrender all [f]ourth [a]mendment protection by venturing into the public sphere. To the contrary, what [one] seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected. . . . A majority of this [c]ourt has already recognized that individuals have a reasonable expectation of privacy in the whole of their physical movements. [*United States* v. *Jones*, 565 U.S. 400, 430, 132 S. Ct. 945, 181 L. Ed. 2d 911 (2012) (Alito, J., concurring); id., 415 (Sotomayor, J., concurring)]. Prior to the digital age, law enforcement might have pursued a suspect for a brief stretch, but doing so for any extended period of time was difficult and costly and therefore rarely undertaken. Id., [429 (Alito, J., concurring)]. For that reason, society's expectation has been that law enforcement agents and others would not—and indeed, in the main, simply could not—secretly monitor and catalogue every single movement of an individual's car for a very long period." (Citation omitted; internal quotation marks omitted.) *Carpenter* v. *United States*, supra, 138 S. Ct. 2217. The court further observed that, "like GPS monitoring, cell phone tracking is remarkably easy, cheap, and efficient compared to traditional investigative tools." Id., 2217–18.

Cell phone tracking, the court observed, presented "even greater privacy concerns than the GPS monitoring of a vehicle [it] considered in *Jones*. Unlike [a] bugged container . . . or the car in *Jones*, a cell phone—almost a feature of human anatomy . . . tracks nearly exactly the movements of its owner. While individuals regularly leave their vehicles, they compulsively carry cell phones with them all the time. A cell phone faithfully follows its owner beyond public thoroughfares and into private residences, doctor's offices, political headquarters, and other potentially revealing locales. . . . Accordingly, when the [g]overnment tracks the location of a cell phone it achieves near perfect surveillance, as if it had attached an ankle monitor to the phone's user." (Citations omitted; internal quotation marks omitted.) Id., 2218.

The concerns expressed by the court in *Carpenter* regarding historical CSLI apply with equal force to prospective CSLI. As that court observed, "the time-stamped data provides an intimate window into a person's life, revealing not only his particular movements, but through them his familial, political, professional, religious, and sexual associations." (Internal quotation marks omitted.) Id., 2217. An individual's cell phone

has the ability to disclose increasingly exhaustive information regarding that person's movements, revealing the most intimate details of that individual's life. See generally J. Valentino-DeVries et al., "Your Apps Know Where You Were Last Night, and They're Not Keeping It Secret," N.Y. Times, December 10, 2018, p. A1 (describing abilities of smartphone apps to track individuals' movements and discussing privacy implications of smartphone technology). We therefore conclude that the trial court properly granted the defendant's motions to suppress the CSLI obtained from the two prospective ex parte orders.[14]

### III

Finally, we address the state's claim that, although, as the state concedes, Johnson's arrest was tainted by the illegally obtained CSLI, the trial court improperly concluded that the state had failed to prove that, in the absence of the illegally obtained CSLI, it inevitably would have obtained Johnson's postarrest statement through lawful means. Therefore, the state contends, the trial court improperly suppressed Johnson's potential trial testimony.[15] The state argues that, in arriving at that conclusion, the trial court improperly concluded that in order to prove inevitable discovery, the state was required to prove that Johnson would have testified in a manner similar to and consistent with the statement that he gave to the police when he was confronted with the illegally obtained CSLI.[16] The state claims that all it was required to prove under the inevitable discovery doctrine was that it would inevitably have identified and located Johnson. The defendant responds that the trial court correctly concluded that the state failed to meet its burden to prove that the inevitable discovery doctrine applied under the facts of the present case.

The trial court credited the testimonial evidence presented by the state at the suppression hearing in support of its claim that, even if it had not relied on the illegally obtained CSLI, it inevitably would have discovered Johnson by lawful means. The court further found, however, that the state failed to sustain its burden to prove that, in the absence of the illegally obtained CSLI, it would have obtained the same information from Johnson. We conclude that the trial court properly determined that, in order to bear its burden to prove that the inevitable discovery exception to the exclusionary rule applied, the state was required to prove by a preponderance of the evidence not only that it inevitably would have identified and located Johnson by legal means, but also that, under the different circumstances, Johnson would have cooperated and provided the same information.

We have explained that " '[a]pplication of the exclusionary rule . . . is not automatic.' " *State* v. *Spencer*, 268 Conn. 575, 599, 848 A.2d 1183, cert. denied, 543 U.S. 957, 125 S. Ct. 409, 160 L. Ed. 2d 320 (2004). "Under

the inevitable discovery rule, evidence illegally secured in violation of the defendant's constitutional rights need not be suppressed if the state demonstrates by a preponderance of the evidence that the evidence would have been ultimately discovered by lawful means." *State* v. *Badgett*, 200 Conn. 412, 433, 512 A.2d 160, cert. denied, 479 U.S. 940, 107 S. Ct. 423, 93 L. Ed. 2d 373 (1986). The inevitable discovery doctrine is "based on the premise that the interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a worse, position that they would have been in if no police error or misconduct had occurred." (Emphasis omitted; internal quotation marks omitted.) *State* v. *Vivo*, 241 Conn. 665, 672, 697 A.2d 1130 (1997).

This court has not addressed the question of whether the state must prove not only that it would inevitably have discovered the witness but also that it would have obtained the testimony or statements of that witness that were procured through illegal means. The decisions of the United States Court of Appeals for the Second Circuit discussing the state's burden to prove that the inevitable discovery exception to the exclusionary rule applies in a given case, however, are instructive. See *Martinez* v. *Empire Fire & Marine Ins. Co.*, 322 Conn. 47, 62, 139 A.3d 611 (2016) ("[w]hen addressing questions of federal law, we give special consideration to the decisions of the Second Circuit"). Specifically, the Second Circuit has explained that "proof of inevitable discovery involves no speculative elements but focuses on demonstrated historical facts capable of ready verification or impeachment, *United States* v. *Eng*, 971 F.2d 854, 859 (2d Cir. 1992), quoting [*Nix* v. *Williams*, 467 U.S. 431, 445 n.5, 104 S. Ct. 2501, 81 L. Ed. 2d 377 (1984)]. The focus on demonstrated historical facts keeps speculation to a minimum, by requiring the [D]istrict [C]ourt to determine, viewing affairs as they existed at the instant before the unlawful search occurred, what would have happened had the unlawful search never occurred. . . . Evidence should not be admitted, therefore, unless a court can find, with a *high level of confidence*, that *each* of the contingencies necessary to the legal discovery of the contested evidence would be resolved in the government's favor." (Citations omitted; emphasis altered; internal quotation marks omitted.) *United States* v. *Stokes*, 733 F.3d 438, 444 (2d Cir. 2013), citing *United States* v. *Cabassa*, 62 F.3d 470, 472–73 (2d Cir. 1995).

The United States District Court for the Southern District of New York has applied the standard set forth by the Second Circuit to conclude that one of the contingencies that the state must establish is that a witness whose statement had been obtained by illegal means would have been cooperative if the state had identified, located and questioned the witness through legal

means. *United States* v. *Ghailani*, 743 F. Supp. 2d 242, 254 (S.D.N.Y. 2010). The court reasoned that, pursuant to the standard that was first announced in *United States* v. *Cabassa*, supra, 62 F.3d 472–73, "[i]nevitable discovery analysis . . . requires a court to examine *each of the contingencies* that would have had to have been resolved favorably to the government in order for the evidence to have been discovered legally and to assess the probability of that having occurred." (Emphasis in original; internal quotation marks omitted.) *United States* v. *Ghailani*, supra, 253–54.

The requirement that the state prove that each contingency would have been resolved in its favor demands that, at the least, the state had to prove at the suppression hearing that it would have identified, located and secured the same level of cooperation from Johnson in the absence of the illegally obtained CSLI. The trial court found that the state had established that it would have identified and located Johnson. The court grounded its rejection of the state's reliance on the inevitable discovery doctrine, however, on the state's failure to prove that, if found by legal means and if questioned without the reliance on the illegally obtained CSLI, Johnson would have cooperated to the same extent. Johnson's cooperation was a contingency upon which the procurement of a statement incriminating himself and the defendant depended. The state bore the burden, therefore, to prove that this contingency would have resolved in its favor.

The state failed, however, to present *any* evidence to demonstrate that Johnson would have similarly cooperated in the absence of being confronted with the illegally obtained CSLI. For example, as the trial court observed, the state did not present Johnson's testimony at the hearing. Due to that failure, the court observed, "the record is utterly barren concerning the circumstances of [his] interrogation and [his] willingness or unwillingness to give his statements or to testify." We further observe that the state failed to present any evidence at the suppression hearing as to how it would have obtained the same cooperation from Johnson in the absence of the illegally obtained CSLI and did not make a proffer or otherwise articulate what other sources or means it had available that would have led the state to discover the same information it obtained from Johnson. Because the state failed to present any evidence regarding the likelihood of Johnson's cooperation under different circumstances, the trial court properly reasoned that any conclusion regarding Johnson's cooperation would have rested on pure speculation. The court properly concluded that the state failed to sustain its burden to prove that the inevitable discovery exception applied.

The judgments are affirmed.

In this opinion the other justices concurred.

* The listing of justices reflects their seniority status on this court as of the date of oral argument.

[1] The state appealed to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[2] The defendant was charged in twelve of the informations with, inter alia, various burglary and larceny charges. As to the thirteenth information, Docket No. CR-11-0076427-S, referenced in the trial court's corrected consolidated memorandum of decision, the record contains neither the information nor the judgment file for that docket. Nor is there any other document in the record that identifies the charges filed against the defendant in that docket. We observe that, although the trial court, *Clifford, J.*, subsequently indicated that it was granting dismissal in all thirteen dockets, in its appeal form, the state did not list the judgment in Docket No. CR-11-0076427-S as a judgment from which the state is appealing. The state appeals only from the judgments in the remaining twelve dockets.

[3] General Statutes (Rev. to 2009) § 54-47aa provides in relevant part:

"(a) For the purposes of this section:

"(1) 'Basic subscriber information' means: (A) Name, (B) address, (C) local and long distance telephone connection records or records of session times and durations, (D) length of service, including start date, and types of services utilized, (E) telephone or instrument number or other subscriber number or identity, including any assigned Internet protocol address, and (F) means and source of payment for such service, including any credit card or bank account number;

"(2) 'Call-identifying information' means dialing or signaling information that identifies the origin, direction, destination or termination of each communication generated or received by a subscriber or customer by means of any equipment, facility or service of a telecommunications carrier;

. . .

"(b) A law enforcement official may request an ex parte order from a judge of the Superior Court to compel (1) a telecommunications carrier to disclose call-identifying information pertaining to a subscriber or customer, or (2) a provider of electronic communication service or remote computing service to disclose basic subscriber information pertaining to a subscriber or customer. The judge shall grant such order if the law enforcement official states a reasonable and articulable suspicion that a crime has been or is being committed or that exigent circumstances exist and such call-identifying or basic subscriber information is relevant and material to an ongoing criminal investigation. The order shall state upon its face the case number assigned to such investigation, the date and time of issuance and the name of the judge authorizing the order. The law enforcement official shall have any ex parte order issued pursuant to this subsection signed by the authorizing judge within forty-eight hours or not later than the next business day, whichever is earlier. . . ."

Unless otherwise indicated, all subsequent references to § 54-47aa in this opinion are to the 2009 revision.

[4] The November 15 and 22, 2010 ex parte orders were directed to T-Mobile USA, Inc., at the same business address as the October 22, 2010 order. The record does not clarify any reason for the difference in corporate name, and we refer in this opinion to the telecommunications carrier as T-Mobile.

[5] The trial court noted that the defendant had filed identical motions to suppress in four of the criminal dockets and further noted that, "[a]lthough no written suppression motions have been filed in the remaining files, the parties agreed at the hearing that the already filed motions address issues common to all files." Accordingly, the court considered the defendant to have filed motions to suppress in the remaining files.

[6] The trial court also concluded that the state had failed to prove that Johnson's statement and potential testimony were sufficiently attenuated from the tainted arrest. The state claims that the attenuation doctrine is not implicated under the facts of the present case and challenges only the trial court's finding that it failed to prove that the inevitable discovery exception to the exclusionary rule applied. Accordingly, we consider only whether the trial court properly analyzed the inevitable discovery doctrine.

[7] The statute has subsequently been amended to clarify that a judge of the Superior Court must make a finding of probable cause prior to issuing an order compelling a telecommunications carrier to disclose "the geolocation data associated with such subscriber's or customer's call-identifying information . . . ." General Statutes § 54-47aa (b); see Public Acts 2016, No. 16-148, § 1.

[8] The state contends that we should not apply *Carpenter* to this appeal unless we first conclude that the October 22, 2010 ex parte order was issued in violation of § 54-47aa (b). The state relies on the principle that this court "eschew[s] unnecessarily deciding constitutional questions . . . ." (Citations omitted.) *Hogan* v. *Dept. of Children & Families*, 290 Conn. 545, 560, 964 A.2d 1213 (2009). The jurisprudential principles underlying that policy are not implicated in the present case, however, where *Carpenter* is clearly dispositive of the issue of whether the state obtained the defendant's historical CSLI in violation of the fourth amendment.

In the alternative, the state contends that *Carpenter* would not prohibit the October 22, 2010 ex parte order. The state points to the majority's response in *Carpenter* to Justice Kennedy's claim in his dissent that the majority had established "an arbitrary [six day] cutoff . . . [that] suggests that less than seven days of location information may not require a warrant." *Carpenter* v. *United States*, supra, 138 S. Ct. 2234 (Kennedy, J., dissenting). The majority rejected that characterization, responding that "we need not decide whether there is a limited period for which the [g]overnment may obtain an individual's historical CSLI free from [f]ourth [a]mendment scrutiny, and if so, how long that period might be. It is sufficient for our purposes . . . to hold that accessing seven days of CSLI constitutes a [f]ourth amendment search." Id., 2217 n.3. We believe that a fair reading of the decision is that accessing CSLI for seven days or more is clearly a search for purposes of the fourth amendment. What the court left unsettled is whether accessing CSLI for fewer than seven days constitutes a search. At best, therefore, *Carpenter* leaves unanswered the question of whether an order targeting a very short time frame would be permitted under the fourth amendment. More importantly for purposes of the present case, however, is that, even if the state were correct that *Carpenter* is limited to cases in which the state accesses more than six days of CSLI, the October 22, 2010 ex parte order falls well within that rule. As the state acknowledges, that order authorized the disclosure of sixty-two days of historical CSLI, from July 29 to September 29, 2010.

Finally, we observe that the state appears to suggest that, if it is correct that the holding in *Carpenter* is limited to instances in which the state has accessed seven days or more of historical CSLI, this court should remand to the trial court for a hearing to determine which six days of historical CSLI the state *would have sought* if they had been aware of the supposed six day limit. Even if we agreed with the state's reading of *Carpenter*, we would categorically reject that claim. We find the procedure requested by the state to be inappropriate in the present case, in which the state seeks the opportunity to return to the trial court so that it may belatedly attempt to "correct" the infringement with the benefit of having reviewed all the data for the critical pieces of evidence.

[9] As we noted previously in this opinion, the state's concession that the two prospective orders violated § 54-47aa has rendered it unnecessary to resolve whether those orders also violate the fourth amendment. Moreover, it is at best unclear whether the holding in *Carpenter* would extend to the two prospective orders. Neither of the two orders authorized the release of more than three days of CSLI and both applied prospectively. Although we see no difficulty in extending the rationale of *Carpenter* as applied to historical CSLI to prospective orders, the court expressly declined to resolve whether its holding would extend to orders authorizing the disclosure of fewer than seven days of CSLI. *Carpenter* v. *United States*, supra, 138 S. Ct. 2217 n.3. See footnote 8 of this opinion. This court "eschew[s] unnecessarily deciding constitutional questions . . . ." (Citations omitted.) *Hogan* v. *Dept. of Children & Families*, 290 Conn. 545, 560, 964 A.2d 1213 (2009). Accordingly, in light of the state's concession and the court's failure in *Carpenter* to provide a clear resolution of the constitutional question—at least as to the two prospective orders—we confine our analysis to considering whether application of the exclusionary rule is the proper remedy for a violation of § 54-47aa.

[10] General Statutes § 54-41m provides: "Any aggrieved person in any trial, hearing or proceeding in or before any court, department, officer, agency, regulatory body or other authority of the state of Connecticut, or of a political subdivision thereof, may move to suppress the contents of any intercepted wire communication, or evidence derived therefrom, on the grounds that the communication was unlawfully intercepted under the provisions of this chapter; the order of authorization or approval under which it was intercepted is insufficient on its face; or the interception was not made in conformity with the order of authorization or approval. Such motion shall be made

before the trial, hearing or proceeding unless there was no opportunity to make such motion or the person was not aware of the grounds of the motion, in which case such motion may be made at any time during the course of such trial, hearing or proceeding. If the motion is granted, the contents of the intercepted wire communication, or evidence derived therefrom, shall be treated as having been obtained in violation of this chapter and shall not be received in evidence in any such trial, hearing or proceeding. The panel, upon the filing of such motion by the aggrieved person, shall make available to the aggrieved person or his counsel for inspection the intercepted communication and evidence derived therefrom."

[11] Other statutes to which the state refers that expressly provide for suppression as a remedy include General Statutes §§ 54-41*l*, 54-1c, 46b-137 (a) and 14-227a (b).

[12] The state claims that the reporting requirement in § 54-47aa (g) suggests a remedy other than suppression. Subsection (g) requires the chief state's attorney to submit an annual report itemizing certain statistics regarding orders issued pursuant to § 54-47aa, including the number of motions to vacate that were filed, and the number of such motions granted and denied. See General Statutes (Rev. to 2009) § 54-47aa (g) (6).

The state's suggestion, however, that a motion to vacate could serve as a remedy for an order granted in violation of § 54-47aa, cannot be reconciled with the nature of the order—it is ex parte. Notice of the order is only required to be provided to the subscriber forty-eight hours after the order is issued, and there are numerous bases upon which a law enforcement officer may request that notice not be given. See General Statutes (Rev. to 2009) § 54-47aa (d). Given the delayed notice available to a subscriber, a motion to vacate can hardly be considered an efficacious remedy.

[13] We find unpersuasive the state's reliance on *Virginia* v. *Moore*, 553 U.S. 164, 128 S. Ct. 1598, 170 L. Ed. 2d 559 (2008), for the proposition that this court cannot conclude that suppression is an appropriate remedy for a violation of a statute that implicates the same important interests that are protected by the fourth amendment. The state's argument relies on a misreading of *Moore*. That case involved the question of whether "a police officer violates the [f]ourth [a]mendment by making an arrest based on probable cause but prohibited by state law." Id., 166. In *Moore*, the defendant was arrested for the misdemeanor of driving with a suspended license. Id., 167. Under applicable state law, however, the officers should have issued the defendant a summons instead of arresting him. Id. In a search incident to the arrest, the officers discovered that the defendant had crack cocaine on his person. Id. The defendant sought suppression of the crack cocaine on the basis that, because the arrest violated state statutory law, it automatically violated the defendant's fourth amendment rights, and, therefore, he was entitled to the protection of the exclusionary rule. Id., 167–68. The court rejected that argument, explaining, "[w]e are aware of no historical indication that those who ratified the [f]ourth [a]mendment understood it as a redundant guarantee of whatever limits on search and seizure legislatures might have enacted." Id., 168. The court explained further that the problem is that "the [f]ourth [a]mendment's meaning [does] not change with local law enforcement practices—even practices set by rule. While those practices vary from place to place and from time to time, [f]ourth [a]mendment protections are not so variable and cannot be made to turn upon such trivialities." (Internal quotation marks omitted.) Id., 172.

In contrast to *Moore*, we are not presented in this appeal with the question of whether a violation of § 54-47aa automatically constitutes a violation of the fourth amendment, thus entitling the defendant to the protection of the exclusionary rule. The defendant's argument is that the violation of § 54-47aa triggers the rule's protections because of the *important nature of the interests* implicated by the statute, interests that are also protected by the fourth amendment. Accordingly, the concerns expressed by the court in *Moore* do not apply in the present case, in which we hold only that suppression is required for a violation of § 54-47aa because the statute implicates important interests protected by the fourth amendment. It is the importance of the protected interests—not the force of the fourth amendment itself—that requires suppression in the present case. Our decision does not reduce the fourth amendment to a redundancy; it simply recognizes that the fourth amendment is not the only means by which those important interests are protected.

[14] To the extent that the state's brief may be read to suggest that the good faith exception to the exclusionary rule applies in Connecticut when the basis for the rule's application is a statutory, rather than a constitutional

violation, we reject that argument. As we have explained in this opinion, in *State* v. *Marsala*, supra, 216 Conn. 171, we *categorically rejected* the good faith exception to the exclusionary rule.

[15] The state does not challenge the portion of the trial court's ruling suppressing Johnson's postarrest statement and concedes that Johnson's statement was obtained illegally. We observe that, although the state challenges only the portion of the trial court's ruling suppressing Johnson's potential testimony, if called to testify, he would have had to testify consistent with his prior statement to the police or risk negative consequences, including further charges. Accordingly, we question the efficacy of the state's concession of the inadmissibility of Johnson's statement in light of its challenge to his potential testimony.

[16] The state claims that, in concluding that the inevitable discovery doctrine required the state to prove that Johnson would have testified in a similar manner, the trial court improperly conflated the attenuation and inevitable discovery doctrines. Because we conclude that the trial court properly applied the inevitable discovery doctrine, we need not resolve the state's claim that the court conflated the two doctrines.