******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

## TAMARIUS MANER *v.* COMMISSIONER OF CORRECTION
### (AC 47644)

Elgo, Moll and Suarez, Js.

*Syllabus*

The petitioner, who previously had been convicted of various crimes, including felony murder, appealed following the granting of his petition for certification to appeal from the habeas court's judgment denying his petition for a writ of habeas corpus. He claimed, inter alia, that the court improperly denied his freestanding constitutional claim, which asserted that the police had illegally obtained records containing his historical cell site location information (CSLI) in violation of his rights under the fourth amendment to the United States constitution. *Held*:

This court declined to review the petitioner's claim that the United States Supreme Court's decision in *Carpenter* v. *United States* (585 U.S. 296), holding that the government must generally obtain a warrant supported by probable cause before acquiring an individual's CSLI, should be applied retroactively, as the petitioner had expressly abandoned that claim.

This court declined to review the petitioner's various unpreserved claims related to the statute (§ 54-47aa) governing orders to compel disclosure of or applications to a telecommunications carrier or provider for certain CSLI, as he did not plead these claims in his petition for habeas corpus and, thus, they were not decided by the habeas court.

This court concluded that, even if it is assumed that the petitioner's CSLI should have been excluded at his criminal trial, any error in its admission was harmless beyond a reasonable doubt, as that evidence was not critical to the state's case against the petitioner and, thus, did not contribute to or substantially affect the jury's verdict.

Argued May 27—officially released November 25, 2025

*Procedural History*

Amended petition for a writ of habeas corpus, brought to the Superior Court in the judicial district of Tolland and tried to the court, *Bhatt, J.*; judgment denying the petition, from which the petitioner, on the granting of certification, appealed to this court. *Affirmed.*

*Nicole Britt*, assigned counsel, with whom, on the brief, was *Christopher Y. Duby*, assigned counsel, for the appellant (petitioner).

*Timothy F. Costello*, supervisory assistant state's attorney, with whom, on the brief, were *Maureen Platt*, state's attorney, *Kelly Masi*, senior assistant state's attorney, and *Thai Chhay*, assistant state's attorney, for the appellee (respondent).

*Opinion*

SUAREZ, J. The petitioner, Tamarius Maner, appeals, following the granting of his petition for certification to appeal, from the judgment of the habeas court denying his second amended petition for a writ of habeas corpus. He claims on appeal, inter alia, that (1) the court improperly denied his freestanding constitutional claim, which asserted that the police had illegally obtained records containing his historical cell site location information (CSLI) in violation of his rights under the fourth amendment to the United States constitution, (2) the 2016 amendments to General Statutes § 54-47aa contained in Public Acts 2016, No. 16-148, § 1 (2016 amendments), which require the police to obtain a warrant based on probable cause before obtaining historical CSLI, should apply retroactively in the present case, (3) certain CSLI obtained by the police did not comply with General Statutes (Rev. to 2007) § 54-47aa,[1] and (4)

---

[1] General Statutes (Rev. to 2007) § 54-47aa provides in relevant part:

"(a) For the purposes of this section:

"(1) 'Basic subscriber information' means: (A) Name, (B) address, (C) local and long distance telephone connection records or records of session times and durations, (D) length of service, including start date, and types of services utilized, (E) telephone or instrument number or other subscriber number or identity, including any assigned Internet protocol address, and (F) means and source of payment for such service, including any credit card or bank account number;

"(2) 'Call-identifying information' means dialing or signaling information that identifies the origin, direction, destination or termination of each communication generated or received by a subscriber or customer by means of any equipment, facility or service of a telecommunications carrier

the court incorrectly concluded that any error in the admission of the petitioner's CSLI was harmless beyond a reasonable doubt. For the reasons that follow, we reject the petitioner's claims and, accordingly, affirm the judgment of the court.

The following facts and procedural history, as gleaned from the record and as previously set forth by this court on the petitioner's direct appeal, are relevant. See *State* v. *Maner*, 147 Conn. App. 761, 83 A.3d 1182, cert. denied, 311 Conn. 935, 88 A.3d 550 (2014). "On October 26, 2008, Maria Guadalupe Orzuna-Sanchez, who was dating the [petitioner], encountered Joseph [Samaha][2] on a street corner in Waterbury. Orzuna-

* * *

"(b) A law enforcement official may request an ex parte order from a judge of the Superior Court to compel (1) a telecommunications carrier to disclose call-identifying information pertaining to a subscriber or customer, or (2) a provider of electronic communication service or remote computing service to disclose basic subscriber information pertaining to a subscriber or customer. The judge shall grant such order if the law enforcement official states a reasonable and articulable suspicion that a crime has been or is being committed or that exigent circumstances exist and such call-identifying or basic subscriber information is relevant and material to an ongoing criminal investigation. The order shall state upon its face the case number assigned to such investigation, the date and time of issuance and the name of the judge authorizing the order. The law enforcement official shall have any ex parte order issued pursuant to this subsection signed by the authorizing judge within forty-eight hours or not later than the next business day, whichever is earlier. . . ."

As stated previously, "[t]he statute has subsequently been amended to clarify that a judge of the Superior Court must make a finding of probable cause prior to issuing an order compelling a telecommunications carrier to disclose the geo-location data associated with such subscriber's or customer's call-identifying information . . . ." (Internal quotation marks omitted.) *State* v. *Brown*, 331 Conn. 258, 273 n.7, 202 A.3d 1003 (2019); see Public Acts 2016, No. 16-148, § 1.

For clarity, following the practice of the parties, all references to the "2008 version" of § 54-47aa in this opinion are to the 2007 revision of the statute, which was in effect at the time the police obtained the petitioner's CSLI in October, 2008.

[2] Although this witness' surname was spelled "Samaba" in this court's decision on direct appeal, the transcripts of the petitioner's underlying crimi-

Sanchez, [Samaha], the [petitioner], and another individual went to the apartment of the victim, James Caffrey. Orzuna-Sanchez and [Samaha] smoked marijuana while the [petitioner] spoke with the victim about purchasing marijuana from him. The victim retrieved some marijuana from his bedroom and sold the [petitioner] seven grams. Later in the evening, the [petitioner] announced that he had to leave in order to take a train to return home to Bridgeport.

"The victim lived with his girlfriend, Samantha Bright, and a roommate, Ray Ramos, in a second floor apartment. The victim's mother lived in the first floor apartment beneath the victim. At some point, the victim and Bright went to sleep. Bright heard the doorbell ring about 1:15 in the morning, and the victim went to the door, turning on lights in the living room, kitchen and hallway. Bright heard a brief conversation, followed by a single gunshot. Before she could get out of the bed, the [petitioner], wearing a khaki sweatshirt, and Calvin Bennett,[3] wearing a gray sweatshirt, appeared in the doorway, and both were holding small black guns. Bennett approached Bright, placed his gun to the back of her head and asked where the money and marijuana was. She indicated that it was in the top dresser drawer. As the [petitioner] opened the drawer, the victim's mother, Emilia Caffrey,[4] who had come upstairs and into the second floor apartment, began screaming. Caffrey saw her son face down on the floor and 'full of

nal trial reveal that the witness spelled his name "Samaha." The former appears to have been a scrivener's error.

[3] "A three judge panel unanimously found Bennett guilty of felony murder, home invasion and burglary in the first degree. *State* v. *Bennett*, 307 Conn. 758, 760, 59 A.3d 221 (2013). A majority of the panel found Bennett guilty of aiding and abetting murder in violation of General Statutes §§ 53a-8 and 53a-54a. Id. On appeal, our Supreme Court concluded that the evidence was insufficient to support Bennett's conviction of aiding and abetting murder. Id., 760–61." *State* v. *Maner*, supra, 147 Conn. App. 763 n.1.

[4] For the sake of convenience, we refer in this opinion to James Caffrey as the victim and to Emilia Caffrey by her surname.

blood.' The [petitioner] and Bennett exited the bedroom and the [petitioner] shot at Caffrey, who fell to the floor.

"Francis Brevetti, a Waterbury police officer, received a call from the police dispatch of possible gunshots fired at the victim's apartment. After he arrived at the scene, Brevetti turned the victim over and observed a bullet wound in the victim's head and a spent .45 caliber casing. . . . The victim later died, and it was determined that the cause of death was a gunshot wound to the head." (Footnotes added; footnote in original.) Id., 763–64.

The police interviewed several individuals who were at the victim's residence on October 26, 2008. As a result of those interviews, the police identified the petitioner as a person of interest. The police interviewed the petitioner on October 27, 2008. During that interview, the petitioner admitted that he was at the victim's residence on October 26, 2008, and that he purchased marijuana from the victim. He initially asserted that he was in Bridgeport at the time of the shooting. During that interview, the police obtained the petitioner's CSLI without an ex parte order, citing exigent circumstances.[5] The petitioner's CSLI revealed that his cell phone was in Waterbury at the time of the shooting, rather than Bridgeport. On October 28, 2008, the police obtained an ex parte order to obtain the petitioner's CSLI on the ground that they had a reasonable and articulable suspicion that a crime had been or was being committed.

[5] The petitioner also claims on appeal that the police illegally obtained his CSLI on October 27, 2008, without an ex parte order, on the ground that there were no exigent circumstances present. The petitioner concedes that the "October 28, 2008 [CSLI was] an independent source of this information." We need not address this claim in light of our dispositive conclusions that (1) the petitioner cannot succeed in his challenge to the admission of the CSLI obtained on October 28, 2008, and (2) any error in the admission of the petitioner's CSLI was harmless.

The petitioner subsequently was arrested and charged with, inter alia, felony murder in violation of General Statutes § 53a-54c, home invasion in violation of General Statutes § 53a-100aa (a) (1), burglary in the first degree in violation of General Statutes § 53a-101 (a) (3), and attempt to commit assault in the first degree in violation of General Statutes §§ 53a-49 (a) (2) and 53a-59 (a) (5). *State* v. *Maner*, supra, 147 Conn. App. 762. Attorneys Dennis Harrigan and Leslie Cavanaugh represented the petitioner at trial.

At trial, Bright and Caffrey testified as witnesses on behalf of the state. Bright and Caffrey testified that, on October 29, 2008, they identified the petitioner in photographic arrays prepared by the Waterbury Police Department. They also each identified the petitioner in court.

At the conclusion of trial, the jury found the petitioner guilty of felony murder, home invasion, burglary in the first degree, and attempt to commit assault in the first degree. Id., 764. The jury failed to reach a verdict with respect to a charge of murder, which the court subsequently dismissed. Id. The court sentenced the petitioner to seventy years of incarceration. Id. The petitioner appealed from the judgment of conviction, which was affirmed by this court. Id., 762–63.

On direct appeal, this court held that, although the trial court improperly admitted into evidence a firearm that was found in Bennett's residence, as well as testimony related to that firearm, any error was harmless. Id., 764–65. This court noted that the jury heard testimony that the petitioner had been in the victim's apartment the day before the shooting. Id., 774. In addition to the petitioner's CSLI, which established that his cell phone was in Waterbury around the time of the shooting, this court stated that the jury heard "Latisha

Caban's[6] statement to the police, admitted pursuant to *State* v. *Whelan*, 200 Conn. 743, 753, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986).[7] Caban stated that the [petitioner] had told her that he was going to Waterbury to 'take some weed.' She further stated that he returned to Bridgeport at approximately 2 a.m., and he told her that 'it wasn't good, nothing happened and not to ask any questions.' " (Footnotes added.) *State* v. *Maner*, supra, 147 Conn. App. 775. This court also noted that the jury heard from "Earl Cornish, a jailhouse informant, who testified that the [petitioner] previously had admitted to participating in the shooting of the victim." Id., 774–75. This court concluded that, "[o]n the basis of the weight of the evidence . . . we cannot conclude that the verdict was substantially swayed by the improper admission of the firearm into evidence." Id., 775.

The petitioner commenced this action by filing a self-represented petition for a writ of habeas corpus in 2016. On December 21, 2022, the petitioner filed a second amended petition for a writ of habeas corpus (operative petition), which is the subject of this appeal. The operative petition contained three counts. Only the third count, in which the petitioner alleged a freestanding violation of his fourth amendment rights,[8] is relevant to this appeal. With respect to this claim, the petitioner

[6] Caban testified that the petitioner was "like a brother" to her.

[7] "In *Whelan*, [our Supreme Court] adopted a hearsay exception allowing the substantive use of prior written inconsistent statements, signed by the declarant, who has personal knowledge of the facts stated, when the declarant testifies at trial and is subject to cross-examination. This rule has also been codified [at] § 8-5 (1) of the Connecticut Code of Evidence, which incorporates all of the developments and clarifications of the *Whelan* rule that have occurred since *Whelan* was decided." (Internal quotation marks omitted.) *State* v. *Sayles*, 348 Conn. 669, 688 n.11, 310 A.3d 929 (2024).

[8] "In habeas corpus proceedings, courts often describe constitutional claims that are not tethered to a petitioner's sixth amendment right to counsel as 'freestanding.' " *McCarthy* v. *Commissioner of Correction*, 192 Conn. App. 797, 810 n.8, 218 A.3d 638 (2019).

alleged that his conviction and incarceration are illegal "because they were obtained in violation of his state and federal constitutional rights against unreasonable searches and seizures as outlined in article first, § 7, of the . . . Connecticut [constitution] and the [fourth and fourteenth] amendments to the . . . United States [constitution] . . . ." Specifically, the petitioner alleged that, on October 27 and 28, 2008, the police illegally obtained his CSLI without a warrant and that there were not any applicable exceptions to the warrant requirements of the state and federal constitutions. The respondent, the Commissioner of Correction, filed a return either denying or leaving the petitioner to his proof as to the material allegations of his operative habeas petition. Additionally, as to count three, the respondent asserted procedural default as a special defense. The petitioner filed a reply denying the respondent's special defense.

A trial on the petitioner's operative habeas petition was held on November 20 and December 6, 2023. Several exhibits were admitted, and the court heard testimony from the petitioner's legal expert witness, Attorney Frank Riccio, as well as Harrigan. With respect to the admission of the petitioner's CSLI, Harrigan testified that he had filed a motion to preclude the CSLI before trial but ultimately did not pursue that motion. Harrigan testified that the defense strategy was to argue that the petitioner's CSLI only established his location in Waterbury, rather than at the crime scene itself. Both parties subsequently filed posttrial briefs.

On March 26, 2024, the habeas court issued a memorandum of decision denying the operative petition.[9] As to the petitioner's fourth amendment claim, the court

---

[9] The court rejected the petitioner's remaining claims of ineffective assistance of his criminal trial counsel and ineffective assistance of appellate counsel. The petitioner has not challenged those aspects of the court's decision.

rejected the petitioner's argument that the United States Supreme Court's decision in *Carpenter* v. *United States*, 585 U.S. 296, 310, 138 S. Ct. 2206, 201 L. Ed. 2d 507 (2018), in which the Supreme Court held that an individual has a "legitimate expectation of privacy in the record of his physical movements as captured through [CSLI]," and, therefore, that "the [g]overnment must generally obtain a warrant supported by probable cause before acquiring [CSLI]"; id., 316; required the police to obtain a warrant based on probable cause to obtain his CSLI. The court noted that, although the petitioner relied on our Supreme Court's decision in *State* v. *Brown*, 331 Conn. 258, 261–66, 202 A.3d 1003 (2019), in which the court, applying *Carpenter*, held that certain ex parte orders issued in 2010 were obtained illegally, that case was distinguishable because the present case was a collateral postconviction proceeding. Therefore, the court stated that it must determine whether *Carpenter* applies retroactively to the petitioner's case and then decide "whether any violation of the fourth amendment or § 54-47aa requires that his convictions be vacated." The court concluded that *Carpenter* should not be applied retroactively, reasoning that *Carpenter* announced a new procedural rule that was not watershed.

The court also concluded that, even if it were to agree that the ex parte orders were illegally obtained, there was ample other evidence to support the conviction without the petitioner's CSLI. The court stated: "Bright and Caffrey testified and identified [the petitioner] as one of the individuals with [a] gun. Caffrey identified [the petitioner] as the individual who shot at her. Bright testified that [the petitioner] had been at the [victim's] house earlier that day and that was corroborated by the testimony of Orzuna-Sanchez and [Samaha], including the fact that [the petitioner] had been interested in purchasing some quantity of marijuana from the victim. The jury also heard from the jailhouse witness Cornish,

who testified that [the petitioner] confessed to him that he had gone to rob the victim and shot him in the face.''

Finally, the court rejected the petitioner's argument that the fruit of the poisonous tree doctrine would have resulted in the suppression of all of the evidence obtained as a result of the petitioner's CSLI, including Bennett's identity, Bennett's CSLI, and the weapon found in Bennett's residence. The court concluded that, assuming arguendo that the reach of the exclusionary rule was "as far as the [petitioner] alleges," there was still ample independent evidence to sustain the petitioner's conviction. The court stated that the petitioner was noted to be a "person of interest when the police identified all of the individuals who had been in the victim's apartment earlier in the day and spoke to all of them. Thus, [the petitioner's] identity was revealed to officers through their interviews of Samaha and Orzuna-Sanchez, not through CSLI . . . ." Accordingly, the court concluded that there was not any reasonable likelihood of a different outcome and, therefore, the petitioner could not establish harm arising from the introduction of his CSLI.

The court granted the petition for certification to appeal. This appeal followed. Additional facts and procedural history will be set forth as necessary.

I

The petitioner first claims that the habeas court improperly rejected his freestanding constitutional claim, which asserted that the police had illegally obtained his CSLI in violation of his fourth amendment rights.[10] As to the CSLI obtained by the police on October 28, 2008, the petitioner asserts that, "[b]ecause Connecticut does not recognize the good faith exception

[10] The petitioner cites to article first, § 7, of the Connecticut constitution, together with the fourteenth amendment to the United States constitution, in count three of the operative petition, which alleges a fourth amendment violation. We do not read the operative petition as alleging a separate state constitutional claim. In the petitioner's brief to this court, within his argu-

to the exclusionary rule and either *Carpenter* or . . . § 54-47aa applies retroactively, the police illegally obtained [his] CSLI . . . .''[11]

We conclude that the petitioner has abandoned any claim that *Carpenter* should be applied retroactively. In *Carpenter*, the United States Supreme Court considered whether the state conducts a "search under the [f]ourth [a]mendment when it accesses historical cell phone records that provide a comprehensive chronicle of the user's past movements." *Carpenter* v. *United States*, supra, 585 U.S. 300. As stated previously in this opinion, the Supreme Court answered that question in the affirmative and held that "an individual maintains a legitimate expectation of privacy in the record of his physical movements as captured through CSLI." Id., 310. Accordingly, the state "must generally obtain a warrant supported by probable cause before acquiring such records." Id., 316. The Supreme Court reasoned that, "[p]rior to the digital age, law enforcement might have pursued a suspect for a brief search, but doing so for any extended period of time was difficult and costly and therefore rarely undertaken," and that cell phone tracking presented "even greater privacy concerns than the GPS monitoring of a vehicle . . . . [A] cell phone—almost a feature of human anatomy . . . tracks nearly

ment that the police violated his fourth amendment rights, the petitioner dedicates one page to "state law," in which he cites to article first, § 7, of the Connecticut constitution, § 54-47aa, and *State* v. *Brown*, supra, 331 Conn. 258. The petitioner, however, did not brief a separate state constitutional claim in accordance with *State* v. *Geisler*, 222 Conn. 672, 684–86, 610 A.2d 1225 (1992), or argue that the state constitution provides him greater protection than does the federal constitution. We therefore limit our review of the petitioner's claim to the federal constitution. See, e.g., *Young* v. *Commissioner of Correction*, 219 Conn. App. 171, 183–84 n.7, 294 A.3d 29, cert. denied, 347 Conn. 905, 297 A.3d 567 (2023).

[11] We need not address the respondent's argument that the court should have found the petitioner's freestanding fourth amendment claim to be procedurally defaulted, in light of our conclusion that the petitioner conceded that *Carpenter* should not apply retroactively in the present case.

exactly the movements of its owner. While individuals regularly leave their vehicles, they compulsively carry cell phones with them all the time. A cell phone faithfully follows its owner beyond public thoroughfares and into private residences, doctor's offices, political headquarters, and other potentially revealing locales. . . . Accordingly, when the [g]overnment tracks the location of a cell phone it achieves near perfect surveillance, as if it had attached an ankle monitor to the phone's user." (Citations omitted; internal quotation marks omitted.) Id., 310–12.

In the present case, the petitioner's counsel conceded at oral argument before this court that *Carpenter* "should not apply retroactively because it is a procedural rule." "Concessions made during oral argument may be properly considered by the appellate courts in rendering their decision." *In re David P.*, 154 Conn. App. 508, 516, 105 A.3d 960 (2014), cert. denied, 315 Conn. 922, 107 A.3d 959 (2015); see also *Greenwich Retail, LLC* v. *Greenwich*, 233 Conn. App. 78, 82 n.4, 340 A.3d 463 (declining to address claim that counsel acknowledged at oral argument before this court was not claim of error), cert. granted, 353 Conn. 913, 344 A.3d 154 (2025). The petitioner further concedes in his principal appellate brief that "[t]his court is unlikely to find that the *Carpenter* case applies retroactively" because the rule announced in *Carpenter* is likely a procedural rule that is "unlikely to be considered a watershed rule" and is unlikely to fall under the new exception announced by our Supreme Court in *Tatum* v. *Commissioner of Correction*, 349 Conn. 733, 753, 322 A.3d 299 (2024), pursuant to which a new constitutional rule of criminal procedure may be applied retroactively if it was developed as a result of developments in science that improve the accuracy of the conviction, and the petitioner "advocated for the rule in the direct proceedings or in an earlier habeas petition." Accordingly,

as the petitioner has expressly abandoned any claim that *Carpenter* should apply retroactively, we decline to address that issue on appeal.

## II

We next address whether the petitioner failed to plead and preserve his claims related to § 54-47aa. The petitioner claims that (1) the 2016 amendments to § 54-47aa should be applied retroactively, and (2) the police did not comply with the 2008 version of § 54-47aa when they obtained his CSLI on October 28, 2008. The respondent counters that this court should not reach the merits of these claims because the petitioner did not include them in his operative petition. We agree with the respondent that these claims are not reviewable because they were not pleaded in the operative petition and were not decided by the habeas court.

The following additional facts and procedural history are relevant. At the habeas trial, Riccio testified that a reasonably competent criminal defense attorney would file a motion to suppress historical CSLI obtained without probable cause in the absence of a warrant or exigent circumstances. On direct examination, the petitioner's counsel questioned Riccio regarding § 54-47aa, and the following colloquy occurred:

"[The Petitioner's Counsel]: Have you ever handled a case in which [the] police sought an ex parte order from a cell phone provider to disclose cell site information for a client?

"[The Witness]: Yes.

"[The Petitioner's Counsel]: And, to your knowledge, is this process controlled by statute?

"[The Witness]: It is now. Yes.

"[The Petitioner's Counsel]: What is your understanding regarding that process under the statute?

"[The Witness]: Under § 54-47aa—

"[The Respondent's Counsel]: Your Honor, at this point I would object . . . . He's testifying about the current statute. It just doesn't seem relevant as to what happened back then.

"The Court: You want to respond to that?

"[The Petitioner's Counsel]: Your Honor, first of all, we're making the argument that it's retroactive. Second of all, we're also asking about the 2008 statute."

The petitioner's counsel proceeded to question Riccio concerning the differences between the statutory language of the 2008 version of § 54-47aa, as opposed to after the 2016 amendments. The petitioner's counsel also questioned Riccio concerning *Carpenter*, and Riccio testified that he was not aware of any court that had applied that decision retroactively.

"Habeas corpus is a civil proceeding. . . . Our rules of practice require a party, as a prerequisite to appellate review, to distinctly raise its claim before the trial court. See Practice Book § 5-2 ([a]ny party intending to raise any question of law which may be the subject of an appeal must . . . state the question distinctly to the judicial authority); Practice Book § 60-5 ([t]he court shall not be bound to consider a claim unless it was distinctly raised at the trial or arose subsequent to the trial). When a party fails to do so, the judicial authority is under no obligation to decide the question. Practice Book § 5-2. Accordingly, Connecticut's appellate courts will not review a claim unless it was distinctly raised at trial." (Citations omitted; internal quotation marks omitted.) *Gonzalez* v. *Commissioner of Correction*, 211 Conn. App. 632, 654–55, 273 A.3d 252, cert. denied, 343 Conn. 922, 275 A.3d 212 (2022).

"[T]he interpretation of pleadings is always a question of law for the court . . . . The modern trend, which

is followed in Connecticut, is to construe pleadings broadly and realistically, rather than narrowly and technically. . . . Although essential allegations may not be supplied by conjecture or remote implication . . . the complaint must be read in its entirety in such a way as to give effect to the pleading with reference to the general theory upon which it proceeded, and do substantial justice between the parties. . . . As long as the pleadings provide sufficient notice of the facts claimed and the issues to be tried and do not surprise or prejudice the opposing party, we will not conclude that the complaint is insufficient to allow recovery." (Footnote omitted; internal quotation marks omitted.) *Carpenter* v. *Commissioner of Correction*, 274 Conn. 834, 842, 878 A.2d 1088 (2005). Practice Book § 23-22 provides in relevant part: "A petition for a writ of habeas corpus . . . shall state: (1) the specific facts upon which each specific claim of illegal confinement is based . . . ."

"It is well settled that [t]he petition for a writ of habeas corpus is essentially a pleading and, as such, it should conform generally to a complaint in a civil action. . . . The principle that a [petitioner] may rely only upon what he has alleged is basic. . . . It is fundamental in our law that the right of a [petitioner] to recover is limited to the allegations of his complaint. . . . While the habeas court has considerable discretion to frame a remedy that is commensurate with the scope of the established constitutional violations . . . it does not have the discretion to look beyond the pleadings and trial evidence to decide claims not raised. . . . This court is not bound to consider claimed errors unless it appears on the record that the question was distinctly raised . . . and was ruled upon and decided by the court adversely to the [petitioner's] claim. . . . This court is not compelled to consider issues neither alleged in the habeas petition nor considered at the habeas proceeding . . . ." (Internal quotation marks

omitted.) *Davis* v. *Commissioner of Correction*, 160 Conn. App. 444, 451, 124 A.3d 992, cert. denied, 319 Conn. 957, 125 A.3d 1012 (2015).

In the present case, the petitioner did not allege in the operative petition that the 2016 amendments to § 54-47aa should apply retroactively or that the police did not comply with the 2008 version of § 54-47aa when it obtained his CSLI on October 28, 2008. The sole reference in the operative petition to § 54-47aa was in the statement of facts, in which the petitioner alleged that, "[o]n October 28, 2008, the police prepared an ex parte order per [§ 54-47aa] to obtain the petitioner's [CSLI] . . . ." Count three, however, the sole count at issue in this appeal, alleged only a fourth amendment violation.

As noted previously, at the habeas trial, the petitioner's counsel questioned Riccio concerning § 54-47aa. In response to an objection by the respondent's counsel, the petitioner's counsel stated: "We're making the argument that [§ 54-47aa is] retroactive. Second of all, we're also asking about the 2008 statute." Counsel, however, questioned Riccio only concerning the retroactivity of *Carpenter*. Although the petitioner's counsel questioned Riccio as to the differences between the 2008 version of § 54-47aa and the 2016 amendments, he did not question Riccio, the petitioner's legal expert witness, as to whether the 2016 amendments should apply retroactively or whether the legislature intended to include historical CSLI in the 2008 version of § 54-47aa. Therefore, in addition to not being raised in the operative petition, the petitioner's statutory claims were not developed during evidence at the habeas trial.

The first time any claim relating to § 54-47aa was meaningfully raised was in the petitioner's posttrial brief. We have repeatedly stated that "[c]laims raised for the first time in posttrial briefs are not reviewable by the habeas court or by this court on appeal." (Internal

quotation marks omitted.) *Antwon W.* v. *Commissioner of Correction*, 172 Conn. App. 843, 877, 163 A.3d 1223, cert. denied, 326 Conn. 909, 164 A.3d 680 (2017); see also, e.g., *Santos* v. *Commissioner of Correction*, 176 Conn. App. 788, 791 n.2, 171 A.3d 1091 (rejecting petitioner's argument that claim was preserved because it was argued in posttrial brief), cert. denied, 327 Conn. 977, 174 A.3d 800 (2017).

The court, therefore, was not obligated to consider the petitioner's statutory grounds for challenging the admission of his CSLI, and this court is not required to do so on appeal. See, e.g., *Davis* v. *Commissioner of Correction*, supra, 160 Conn. App. 454 n.7 (declining to review claim raised for first time in posttrial brief); *Henderson* v. *Commissioner of Correction*, 129 Conn. App. 188, 198, 19 A.3d 705 ("[a] reviewing court will not consider claims not raised in the habeas petition or decided by the habeas court"), cert. denied, 303 Conn. 901, 31 A.3d 1177 (2011). Therefore, the court properly did not address the petitioner's statutory claims in its memorandum of decision.

We are not persuaded by the petitioner's arguments to the contrary. The petitioner argues that the operative petition alleges that "the police illegally obtained [his] historical [CSLI] on October 27 and 28, 2008, without a warrant and that no warrant exception, under either state or federal law, applied." The petitioner further argues that "[t]he fact that [he] explicitly included that the search violated state law *inevitably* involves § 54-47aa as it is the controlling state statute on obtaining CSLI." (Emphasis altered.) We conclude that the petitioner's arguments constitute an impermissible attempt to conflate his statutory claims, which were not pleaded, with his fourth amendment claim, which was pleaded. Count three of the operative petition is titled "fourth amendment violation." A plain reading of the operative petition demonstrates that it does not state

any claim that the 2016 amendments should apply retroactively or that the police failed to comply with the 2008 version of § 54-47aa when they obtained his CSLI on October 28, 2008.[12] Instead, the petitioner alleged that his conviction was illegally obtained "in violation of his state and federal *constitutional rights* . . . as outlined in article first, § 7, of the . . . Connecticut [constitution] and the [fourth amendment] to the . . . United States [constitution] . . . ." Therefore, to the extent that the operative petition referred to state law, those references were only to the Connecticut constitution. Moreover, as stated previously, we do not read the operative petition as alleging a separate state constitutional claim. See footnote 10 of this opinion.

The petitioner does not cite to any authority supporting his argument that his statutory claims are "inevitably" included in his fourth amendment claim. As to his claim that the 2016 amendments to § 54-47aa should apply retroactively, we note that the retroactivity principles applicable to state statutes and to new constitutional procedural rules involve wholly distinct analytical frameworks. Compare, e.g., *Tatum* v. *Commissioner of Correction*, supra, 349 Conn. 752–53 (constitutional analysis), with *State* v. *Bischoff*, 337 Conn. 739, 746–47, 258 A.3d 14 (2021) (statutory analysis). Similarly, the petitioner's claim that the police did not comply with the 2008 version of § 54-47aa when they obtained his CSLI on October 28, 2008, is markedly different from his fourth amendment claim. As reflected in the petitioner's own brief, an analysis of that statutory claim would require an exploration of legislative intent, specifically,

---

[12] We note that count one of the operative petition, which alleged ineffective assistance of criminal trial counsel, claimed that the police illegally obtained his CSLI on October 27, 2008, in the absence of exigent circumstances or an ex parte order. That count, however, is not before us on appeal. Furthermore, as previously stated, we need not address the petitioner's claim relating to the CSLI obtained on October 27, 2008. See footnote 5 of this opinion.

whether the legislature intended for the 2008 version of § 54-47aa to include historical CSLI, as opposed to an evaluation of *Carpenter* and its progeny, as well as other applicable fourth amendment principles.

Accordingly, the petitioner's statutory grounds for challenging the admission of his CSLI constituted separate claims, which should have been pleaded, rather than subsidiary "arguments" in support of his fourth amendment claim. See, e.g., *Jobe* v. *Commissioner of Correction*, 334 Conn. 636, 644 n.2, 224 A.3d 147 (2020) ("[a] claim is an entirely new legal issue, whereas, [g]enerally speaking, an argument is a point or line of reasoning made in support of or in opposition to a particular claim" (internal quotation marks omitted)); see also, e.g., *Crawford* v. *Commissioner of Correction*, 294 Conn. 165, 204, 982 A.2d 620 (2009) (declining to review constitutional claims that could not "fairly be construed as subsumed within or inextricably intertwined with the statutory claim [the petitioner] raised before the trial court").

Furthermore, the petitioner's arguments conflict with our case law and our rules of practice. Practice Book § 23-22 provides in relevant part that a petition for a writ of habeas corpus shall state "the specific facts upon which each *specific claim of illegal confinement* is based . . . ." (Emphasis added.) Practice Book § 10-3 (a) also provides in relevant part: "When a claim made in a complaint . . . or other pleading is grounded on a statute, the statute shall be specifically identified by its number." See, e.g., *Kennynick, LLC* v. *Standard Petroleum Co.*, 222 Conn. App. 234, 243 n.7, 305 A.3d 632 (2023) (declining to consider statutory claim that plaintiff did not allege in complaint pursuant to § 10-3 (a)); see also *Ross* v. *Commissioner of Correction*, 217 Conn. App. 286, 324, 288 A.3d 1055 ("a memorandum of law is not a proper vehicle for supplementing the factual allegations in a complaint . . . and we do not

believe that a different rule should pertain to habeas petitions" (internal quotation marks omitted)), cert. denied, 346 Conn. 915, 290 A.3d 374 (2023). "It is well settled that this court will not review statutory claims that are raised for the first time on appeal." *State* v. *Smith*, 255 Conn. 830, 843, 769 A.2d 698 (2001). We do not see any reason to depart from these well established principles in the present case.

We also reject the petitioner's arguments that the respondent waived the right to challenge the reviewability of his statutory claims. First, the petitioner argues that the respondent "never filed a motion for a more specific statement" to express any "confusion as to the basis of the petitioner's fourth amendment claim." The petitioner, however, does not offer any convincing reason as to why the respondent should have had any confusion concerning his fourth amendment claim. As stated previously, the operative petition did not present any claims that (1) the 2016 amendments to § 54-47aa should apply retroactively, and (2) the police did not comply with the 2008 version of § 54-47aa when they obtained his CSLI on October 28, 2008. Similarly, although the petitioner argues that the respondent agreed to mark a copy of the 2008 version of § 54-47aa as an exhibit at the habeas trial, the fact that the respondent agreed to the admission of the exhibit—in the present case, a statute that speaks for itself—does not constitute an affirmative waiver by the respondent of any claim that the petitioner's statutory claims were not properly raised. We similarly disagree that the fact that the respondent responded to the petitioner's statutory claims in his posttrial brief precludes the respondent from disputing the reviewability of those claims on appeal, particularly when the petitioner did not develop those claims during evidence. In any event, such claims would still be unpreserved even though they were addressed in the parties' posttrial briefs because "the

petitioner did not distinctly raise [them] in his habeas petition, nor did the habeas court specifically rule on [them] in its memorandum of decision.” *Giattino* v. *Commissioner of Correction*, 169 Conn. App. 566, 582, 152 A.3d 558 (2016).

Furthermore, to the extent that the petitioner believed he had, in fact, raised any claims that the court improperly failed to address, “the petitioner did not seek an articulation of the court’s decision . . . .” *Gonzalez* v. *Commissioner of Correction*, supra, 211 Conn. App. 657; see also, e.g., *Davis* v. *Commissioner of Correction*, supra, 160 Conn. App. 456 (“to the extent that the habeas court construed the petitioner’s allegations in a way that the petitioner deems inaccurate or incomplete, the failure of the petitioner to clarify for the habeas court his allegations is fatal to his claim”).[13] We therefore decline to review the petitioner’s unpreserved statutory claims.

### III

Finally, the petitioner claims that the habeas court incorrectly concluded that any error in the admission of his CSLI was harmless beyond a reasonable doubt. Specifically, the petitioner contends that the respondent cannot establish that any error was harmless beyond a reasonable doubt. Although the petitioner concedes that he was a person of interest at the time of his initial interview with the police, he emphasizes that George Tirado of the Waterbury Police Department testified that the petitioner’s CSLI had a “ ‘huge’ ” impact on the investigation because that was the only evidence that “definitively proved” that he had traveled

---

[13] We further note that, although the habeas court granted the petition for certification to appeal, the petitioner also did not raise any claim regarding § 54-47aa in the petition for certification to appeal; rather, he alleged, inter alia, that “the habeas court erred in finding that there was no fourth amendment and/or state *constitutional* violation . . . .” (Emphasis added.)

to Waterbury from Bridgeport around the time of the shooting. The petitioner also argues that, without his CSLI, there was not any indisputable evidence tying him to Bennett the night of the shooting. The petitioner further points to the lack of forensic evidence, such as fingerprints or DNA, directly placing him at the scene. Finally, the petitioner attacks the credibility of the eyewitnesses and other witnesses' testimony presented by the state.

The respondent counters that the court correctly concluded that the evidence of the petitioner's guilt was "exceedingly strong," even without his CSLI.[14] The respondent points to (1) the testimony from Bright, Orzuna-Sanchez, and Samaha, who testified that the petitioner was at the victim's apartment on the afternoon before the shooting, (2) the eyewitness identifications of the petitioner by Caffrey and Bright, (3) Caban's statement to the police, and (4) Cornish's testimony that the petitioner made inculpatory statements that he shot the victim, as independent evidence of the petitioner's guilt. Having reviewed the record in this case, we are convinced that, even assuming the petitioner's CSLI should have been excluded, any error was harmless beyond a reasonable doubt.

We begin with the applicable standard of review. "It is well settled that constitutional search and seizure violations are not structural improprieties requiring reversal, but rather, are subject to harmless error analysis." (Internal quotation marks omitted.) *State* v. *Armadore*, 338 Conn. 407, 437, 258 A.3d 601 (2021). "[T]he test for determining whether a constitutional [error] is harmless . . . is whether it appears beyond a reasonable doubt that the [error] complained of did not contribute to the verdict obtained. . . . If the evidence

[14] The court stated that, "even if [it] were to agree that *Carpenter* applied to [the petitioner] and that the ex parte orders were illegal . . . [he] cannot obtain relief because only the CSLI would be suppressed and there was ample other evidence to convict him . . . ."

may have had a tendency to influence the judgment of the jury, it cannot be considered harmless. . . . That determination must be made in light of the entire record [including the strength of the state's case without the evidence admitted in error]. . . . Additional factors that we have considered in determining whether an error is harmless in a particular case include the importance of the challenged evidence to the prosecution's case, whether it is cumulative, the extent of cross-examination permitted, and the presence or absence of corroborating or contradicting evidence or testimony. . . . In other words, we [must be] satisfied beyond a reasonable doubt that the result would be the same without the admission of the assumedly improper evidence. . . . This inquiry is an objective one and requires us to consider the quality and quantity of both the inadmissible evidence and the admissible evidence that remains to support the verdict of the jury. . . . [T]he [harmless error] inquiry cannot be merely whether there was enough [evidence] to support the result, apart from . . . the error. . . . [R]ather, [the inquiry is] . . . whether the error itself had substantial influence [on the jury]. If so . . . the conviction cannot stand." (Citations omitted; internal quotation marks omitted.) *State v. Correa*, 353 Conn. 338, 373–74, 341 A.3d 910 (2025).

We conclude that, independent of his CSLI, as well as the evidence that the petitioner argues should have been excluded as a result, the state presented overwhelming evidence that the petitioner committed felony murder, home invasion, burglary in the first degree and attempt to commit assault in the first degree.[15] First, the jury heard evidence that, the day preceding the shooting, the petitioner was identified by Bright,

---

[15] As this court previously concluded that the trial court improperly admitted the evidence of the firearm found in Bennett's apartment, and testimony related to that firearm; *State* v. *Maner*, supra, 147 Conn. App. 764–65; we do not consider that evidence in our analysis.

Orzuna-Sanchez, and Samaha as having been present in the victim's apartment. As to motive, this court previously noted that the jury "heard testimony that the [petitioner] had been in the victim's apartment and purchased marijuana from the victim the day before the shooting. As a result of this transaction, he knew that the victim kept his supply of marijuana in the bedroom." (Footnote omitted.) *State* v. *Maner*, supra, 147 Conn. App. 774. Moreover, two eyewitnesses, Bright and Caffrey, both of whom were at the victim's residence at the time of the shooting, each identified the petitioner in a photographic array and testified for the state at trial. Bright and Caffrey also identified the petitioner in court.

We are not persuaded by the petitioner's argument that the admission of his CSLI constituted harmful error because, without his CSLI, there was not any "indisputable evidence that Bennett was with the petitioner the night of the shooting." First, we agree with the habeas court that, even assuming that all the evidence relating to Bennett—including Bennett's identity, his CSLI, and the weapon found in his residence—should have been suppressed under the exclusionary rule, "there was ample independent evidence . . . that implicated the [petitioner]." The petitioner argues that the CSLI was critical because it was the "only definitive evidence" that placed him in Waterbury at the time of the shooting. We do not agree. The state introduced ample additional evidence that the petitioner was in Waterbury at the time of the shooting. As stated previously, Bright and Caffrey identified the petitioner in photographic arrays and in court. Although neither witnessed the shooting itself, both were at the victim's residence at the time and saw the petitioner shortly after the shooting occurred. This court previously noted that Bright testified that, "when the victim went to see who was at the door at approximately 1:15 a.m., he turned on lights in

their apartment as he walked from the bedroom." *State* v. *Maner*, supra, 147 Conn. App. 774. Bright overheard a brief conversation and then a gunshot. Id. She testified that "two men, each holding a small black gun, entered the bedroom. A few days later, she recognized the [petitioner] in a photographic array as the man wearing the tan sweatshirt who looked in the dresser for money and marijuana."[16] Id.

Caffrey testified that she, too, heard a "crackling sound and a thump" and proceeded upstairs to the victim's apartment, where she discovered the victim on the ground, "full of blood," after which time she began screaming. Caffrey then observed the two men, and testified that one of the men, whom she later identified as the petitioner, fired his gun at her but missed. See *State* v. *Maner*, supra, 147 Conn. App. 774. Caffrey testified that the petitioner was a dark-skinned Black male and was wearing a tan hoodie.[17]

Furthermore, the jury had before it a copy of Caban's redacted statement to the police, in which she related that the petitioner had informed her that he was "going to the liquor store and he had to take care of something while he was out." Caban stated that, when the petitioner left the house, he took a BB gun with him. Caban then told the police that the petitioner left for approximately fifteen minutes, returned, and then told her he was "going back to Waterbury to take care of something and take some weed," and twice stated, "[D]on't worry about it." Caban stated that, approximately twenty minutes after the petitioner left, he called her and asked

_____

[16] Officer Frank Brevetti of the Waterbury Police Department testified that he responded to the scene and spoke to Bright. He noted that she had described the petitioner and Bennett to him as two Black males with "large builds."

[17] Orzuna-Sanchez also testified that, when the petitioner left the victim's apartment, she recalled that he was wearing a tan hoodie, jeans, and tan Timberland boots.

what exit to take to get to Orzuna-Sanchez' house in Waterbury. Caban then indicated that, at approximately 2 a.m., the petitioner returned home and was "real nervous." Caban stated that the petitioner told her, "[I]t wasn't good, nothing happened and don't ask any questions." Thus, even without his CSLI, the state presented ample independent evidence from which the jury reasonably could have concluded that the petitioner was in Waterbury at the time of the shooting.

This court previously concluded that, even though the trial court had improperly admitted into evidence a firearm found in Bennett's apartment and testimony related to that firearm, any error was not harmful. *State* v. *Maner*, supra, 147 Conn. App. 764–65. In so concluding, this court relied on the eyewitness testimony of Bright and Caffrey, the petitioner's CSLI, Cornish's testimony, and Caban's statement to the police. Id., 774–75; see also, e.g., *State* v. *Bonner*, 290 Conn. 468, 501, 964 A.2d 73 (2009) (there was overwhelming weight of evidence when two eyewitnesses saw defendant point gun at victim's car at time of shooting and state presented testimony of jailhouse informant that defendant confessed to fatally shooting victim). We are not persuaded by the petitioner's argument that, because this court previously relied on his CSLI in concluding that the trial court's error in admitting the firearm evidence was harmless, "this court cannot claim to have a fair assurance that the error did not substantially affect the verdict when the record shows that two impermissible pieces of evidence were used to convict the petitioner." (Internal quotation marks omitted.) This court cited to the petitioner's CSLI as one piece of evidence out of many in concluding that the admission of the firearm evidence was harmless beyond a reasonable doubt. *State* v. *Maner*, supra, 774–75. Thus, this court's prior decision on direct appeal does not preclude our conclusion on collateral review that any error relating to the petitioner's CSLI was also harmless.

The petitioner further argues that the CSLI was important because of the lack of DNA or other forensic evidence directly linking him to the scene. The CSLI in the present case, however, did not pinpoint the petitioner at the scene but, rather, revealed that his cell phone was located in Waterbury. This fact was relied on during defense counsel's closing argument when he stated that "[t]hose cell towers reached two to ten miles away from each other . . . [it] just give[s] you a real relative area." As the petitioner's counsel testified at the habeas trial, "when they were talking [about] Waterbury, we indicated that [this] basically was a three mile circle and they didn't have, at that time, the location—the ability to locate what direction the phone was pinging from. . . . So, you know, our argument was that [the CSLI] didn't . . . necessarily put him at [the victim's residence]." Moreover, although it is true that the petitioner's DNA was not recovered at the scene, "[i]t is well established . . . that a lack of physical evidence does not necessarily equate to a weak case." *State* v. *Ayala*, 333 Conn. 225, 236, 215 A.3d 116 (2019); see, e.g., id. (concluding that, although physical evidence linking defendant to murder would have made state's case stronger, unchallenged testimonial evidence of witnesses demonstrated defendant's guilt); see also, e.g., *State* v. *Fauci*, 282 Conn. 23, 53, 917 A.2d 978 (2007) (concluding that state's case was strong on basis of witness testimony despite lack of physical evidence linking defendant to crime).

We are also not persuaded by the petitioner's challenges to the credibility of the state's witnesses. First, the petitioner questions the identifications of the petitioner made by Bright and Caffrey. Specifically, the petitioner notes that there were discrepancies in the witnesses' physical descriptions of him.[18] The petitioner

[18] During his closing argument, defense counsel focused on Bright's and Caffrey's descriptions of the petitioner's height as "about five ten," stating, "You saw [the petitioner] several times. He's not five ten, not even close."

also argues that "[b]oth [Caffrey and Bright] indicated that they had only observed the men responsible for a few seconds, in a dark apartment, under incredibly stressful circumstances." The weight of that evidence, however, including any discrepancies or infirmities regarding the identification evidence, was customary grist for the jury mill. "Any uncertainty on the witness' part goes toward the weight of the evidence . . . [t]he weaknesses of identifications can be explored on cross-examination and during counsel's final arguments to the jury. . . . Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature." (Internal quotation marks omitted.) *State* v. *Ortiz*, 252 Conn. 533, 556, 747 A.2d 487 (2000); see also, e.g., *State* v. *McLaurin*, 352 Conn. 500, 526, 337 A.3d 1039 (2025) (witness' fear in and of itself does not "render an identification unreliable"); *State* v. *McCarthy*, 105 Conn. App. 596, 604, 939 A.2d 1195 (2008) ("[w]hen determining whether a witness had sufficient time to observe a defendant to ensure a reliable identification . . . a good hard look will pass muster even if it occurs during a fleeting glance . . . a view of even a few seconds may be sufficient for a witness to make an identification . . . it is for the trier of fact to determine the weight to be given that identification" (internal quotation marks omitted)).

The petitioner also noted that, at his criminal trial, the jury heard the petitioner's expert witness, Stephen Penrod, a professor of psychology, testify concerning how various factors, including "stress, weapon focus,

On rebuttal, the prosecutor countered that the evidenced showed that Bright first saw the petitioner when she was "on the floor . . . looking up," indicating that the petitioner may have appeared taller to Bright from her vantage point than he actually was. The prosecutor argued further that, with respect to the photographic arrays, Bright and Caffrey were only shown a face, and, therefore, the issue of the petitioner's height was not a "big issue."

effects of cross-racial identifications, unconscious transference, suggestible police practices, memory, confidence, and accuracy impact identifications."[19] The petitioner relies on that testimony on appeal in attempting to discredit Bright's and Caffrey's identifications of him. Having heard that expert testimony, however, it was for the jury to accept or reject that evidence. See, e.g., *State* v. *LeRoya M.*, 340 Conn. 590, 615, 264 A.3d 983 (2021) ("[t]he [fact finder] is free to accept or reject each expert's opinion in whole or in part" (internal quotation marks omitted)).

The petitioner also challenges the weight of Caban's statement to the police, which was admitted into evidence under *Whelan*, on the ground that Caban had an imperfect memory. First, defense counsel did not object to the admission of Caban's redacted statement. Furthermore, the jury heard testimony revealing Caban's memory deficits,[20] and the trial court determined that Caban was not incompetent to testify. Specifically, the court stated: "While I do believe that this witness may have some memory issues, I do not believe that those memory issues are of such a nature that would make her incompetent to be a witness." To the extent that the jury heard evidence that Caban had an imperfect memory, that issue was an issue of credibility and weight for it to determine. See, e.g., *State* v. *Jacques*, 353 Conn. 122, 157, 340 A.3d 1073 (2025) (noting that courts have suggested that "memory loss, whether genuine or feigned, medical or otherwise, is an issue of credibility and weight for the jury").

---

[19] On appeal to this court, the petitioner has not challenged the identification procedures used by the Waterbury Police Department in conducting the photographic arrays as being unduly suggestive or otherwise improper.

[20] Caban testified on direct examination by the prosecutor that she "[has] a bad memory," stemming from a medical history of seizures, and that, as of the time of her testimony at the petitioner's criminal trial, she did not recall where she was at the time of the shooting.

Finally, the petitioner argues that the record shows that Cornish was a "self-interested felon . . . ."[21] First, defense counsel cross-examined Cornish concerning his motivations for testifying against the petitioner, namely, the fact that he was offered the opportunity to pursue a sentence modification in exchange for his testimony. Furthermore, although the petitioner argues that Cornish had admitted that he had reviewed the petitioner's warrant when they shared a cell, the jury, by virtue of defense counsel's cross-examination, was made aware of this fact and was free to credit his testimony. We also agree with the respondent that Cornish's testimony was corroborated by other evidence. Specifically, (1) Cornish's testimony that the petitioner told him that he shot at Caffrey was corroborated by her own testimony, (2) his testimony that the petitioner told him he had cleaned blood off his shoes was consistent with the victim's injuries,[22] and (3) his testimony that the petitioner claimed to have used a .45 caliber firearm during the shooting was consistent with shell

---

[21] "Cornish testified: '[The petitioner] told me that he was looking for some marijuana. The girl that he was messing with out in Waterbury said she knew somebody who has some marijuana. They went to the kid's house, sold him some marijuana. He asked the kid if he could get some weight, meaning more, like bigger amounts. The kid said yes. And he decided he was going to rob him. So, he went back to Bridgeport, where he's from, tried to get a gun, ended up getting a gun from somebody he referred to as his neighbor, at first. Then he told me the kid's name was Cal. They went back together and robbed the kid—well, knocked on the door, shot him— rang the doorbell, shot him in the face and then robbed him.' " *State* v. *Maner*, supra, 147 Conn. App. 775 n.9.

Cornish also stated: "I guess, on the way back out, [Caffrey] was there. And he said she started flipping out. So he shot at her and ran out [of] the house." Cornish further testified that, "I think [the petitioner] said the police took his shoes, but they wouldn't be able to find the blood on the shoes because of some cleaner he used at his job or something like that." Lucinda Lopes Phelan, a forensic science examiner, noted that she examined a pair of Timberland boots, and they tested negative on her screening test for blood.

[22] Caffrey testified that when she encountered the victim, there was "blood all over the place . . . ."

casings recovered at the scene.[23] See, e.g., *State* v. *Sayles*, 348 Conn. 669, 691, 310 A.3d 929 (2024) ("what may be qualitatively weak evidence—especially standing alone—may grow in strength considerably when viewed in context"), citing *State* v. *Maner*, supra, 147 Conn. App. 780–81.

Moreover, the trial court instructed the jury to weigh Cornish's testimony critically, stating that it "must look with particular care at the testimony of an informant and scrutinize it very carefully before you accept it." See *Birch* v. *Commissioner of Correction*, 334 Conn. 37, 66, 219 A.3d 353 (2019) ("the trial court should instruct the jury that the informant's testimony must be reviewed with particular scrutiny and weighed . . . with greater care than the testimony of an ordinary witness" (internal quotation marks omitted)). We presume that the jury followed that instruction. See, e.g., *State* v. *Parris*, 352 Conn. 652, 682, 338 A.3d 1139 (2025) ("jurors are presumed to follow the instructions given by the judge" (internal quotation marks omitted)). Although it is true that Cornish was given the right to argue for a sentence modification, Cornish testified that the state did not make him any promises as to whether a sentence modification would be granted by the sentencing court. Thus, the jury, "properly instructed on informant testimony, was free to accept and credit [Cornish's] testimony, despite his status as a jailhouse informant." *State* v. *Franklin*, 175 Conn. App. 22, 35 n.14, 166 A.3d 24, cert. denied, 327 Conn. 961, 172 A.3d 801 (2017). As with the other witnesses, defense counsel

[23] Cornish testified that the petitioner told him that he used a .45 caliber firearm during the shooting. Two shell casings were recovered at the scene and were determined to have been fired from the same gun. Maria DiVirgilio Torre, a crime scene technician at the Waterbury Police Department, testified that "[t]here was a spent .45 caliber casing on the rug . . . ." A firearms and toolmark examiner testified that, although he was not certain of the caliber of the recovered casings, "[i]t was a larger caliber. I think I put down over .38."

was given ample opportunity to cross-examine Cornish to expose infirmities in his testimony. See, e.g., *State* v. *Correa*, supra, 353 Conn. 380 (noting extent of cross-examination as part of harmless error analysis).

Finally, we also consider the parties' closing arguments to "determine the evidence's centrality to the factual issues." Id., 381. Specifically, "we analyze the degree of the parties' emphasis and reliance on the improperly admitted evidence [as] indicative of its importance to the jury's verdict." (Internal quotation marks omitted.) Id. The prosecutor began his closing argument by stating, "Let's talk about what the only issue is in this case. Who did it?" The prosecutor proceeded to argue that the petitioner was a guest in the victim's apartment earlier in the day and that he had conversations about purchasing marijuana with the victim. The prosecutor did assert that the petitioner's CSLI revealed, contrary to his initial claim to the police that he had remained in Bridgeport that night, that he had, instead, returned to Waterbury. After summarizing that evidence, however, the prosecutor spent the bulk of the rest of his argument on the identification evidence presented by the state. Specifically, the prosecutor argued that Caffrey was "absolutely certain" that the petitioner was in the apartment. The prosecutor noted that, when Caffrey was shown the photographic array, she identified the petitioner as, "[w]ithout question, without a moment's hesitation, the man who shot at [her]." The prosecutor stated: "Why is this important? Because the defense and I know what this case is about, about identification."

Defense counsel argued in closing that the CSLI "just gives you a relative area," and conceded that, "yes, [the petitioner] and . . . Bennett were both in the Waterbury area." Defense counsel focused the remainder of his closing argument on disputing the credibility of the state's witnesses, particularly that of Bright and Caffrey,

and the fact that there was not any physical evidence linking the petitioner to the scene, such as fingerprints, DNA, or clothing. He also relied on Penrod's testimony in order to discredit the identification evidence. During his rebuttal argument, the prosecutor concluded his argument by emphasizing the eyewitness identification evidence, stating: "[T]he state submits to you that there is no reasonable possibility that this happened any other way than the way the evidence came in. That . . . Caffrey . . . got it right. That, when . . . Bright saw those people come into her room and saw [the petitioner] with a gun, the man in the khaki colored T-shirt, she got it right. . . . And that, when they came to court and look[ed] at [the petitioner] and pointed at him and said, yes, that's the man that was in the kitchen, they got it right. And there is nothing you've heard to tell you that they got it wrong. Dr. Penrod can talk about a lot of things, but he can't tell you that. And, if you look at all of the corroboration that's in this case, all of the different factors, all the different evidence before you, there is no possible doubt that we have proved this case beyond a reasonable doubt." Thus, the petitioner's CSLI, although relied on by the prosecutor, was not "so outsized or critical that we can conclude that this factor would be dispositive in our determination of whether the evidence contributed to the jury's verdict." *State* v. *Correa*, supra, 353 Conn. 382; see also *State* v. *Sayles*, supra, 348 Conn. 698 ("our case law establishes that a prosecutor's reliance on illegally obtained evidence in closing arguments . . . is not dispositive").

Viewed in context, the prosecutor's focus in closing was on the identification evidence, whereas the evidence relating to the petitioner's CSLI was used by the prosecutor to corroborate the witnesses' identifications of the petitioner. Accordingly, we conclude that, although the CSLI was important evidence, it was not critical to the state's case. See, e.g., *State* v. *Correa*,

supra, 353 Conn. 382 (concluding that improper admission of evidence of cell phone's contents was harmless, reasoning that, "[a]lthough the cell phone evidence may have been important, it was not critical to the state's case against the defendant"). Rather, it was cumulative of independent evidence—namely, the testimony of the eyewitnesses, as well as the evidence from Caban and Cornish—that placed the petitioner in Waterbury at the time of the shooting. See, e.g., *State* v. *Armadore*, supra, 338 Conn. 450 ("[b]ecause the admission of the defendant's historical CSLI was cumulative of other evidence establishing that the defendant was near [the scene] at the time of the shooting, and because the state presented other significant evidence of guilt, we conclude that the admission of these records was harmless beyond a reasonable doubt"); *State* v. *Smith*, 156 Conn. App. 537, 567, 113 A.3d 103 (concluding that, "[a]lthough clearly persuasive, the CSLI" presented was merely cumulative of "mountain of additional evidence adduced at trial to establish the defendant's guilt"), cert. denied, 317 Conn. 910, 115 A.3d 1106 (2015).

Therefore, we conclude that the evidence against the petitioner, "viewed cumulatively and in context, was strong, independent of the . . . [CSLI]." *State* v. *Correa*, supra, 353 Conn. 382. Although the CSLI evidence may have been important, it was not critical to the state's case against the petitioner. See, e.g., id. Accordingly, we are not persuaded that, even assuming the petitioner's CSLI was improperly admitted, that evidence contributed to or substantially affected the jury's verdict.

The judgment is affirmed.

In this opinion the other judges concurred.